Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/15/2017 05:13 PM CDT

State of Nebraska, appellee, v.
Corleone M. McCurry, appellant.
___ N.W.2d ___

Filed March 17, 2017.    No. S-15-1114.

1. **Motions for Mistrial: Appeal and Error.** The decision whether to grant a motion for mistrial will not be disturbed on appeal in the absence of an abuse of discretion.
2. **Jury Instructions: Judgments: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.
3. **Jury Instructions: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.
4. ____: ____. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.
5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.
6. **Constitutional Law: Due Process.** The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.
7. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the

same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

8. **Criminal Law: Motions for Mistrial: Proof: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

9. **Motions for Mistrial: Motions to Strike: Appeal and Error.** Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material.

10. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

11. **Hearsay.** Testimony regarding an out-of-court identification is hearsay.

12. **Criminal Law: Constitutional Law: Due Process: Rules of Evidence.** Whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. However, the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.

13. **Sentences: Weapons.** Neb. Rev. Stat. § 28-1205(3) (Reissue 2016) mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrent with no other sentence.

14. **Sentences: Appeal and Error.** An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Convictions affirmed, sentences

affirmed in part and in part vacated, and cause remanded for resentencing.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Corleone M. McCurry appeals his convictions and sentences in the district court for Douglas County for first degree murder, use of a firearm to commit a felony, and possession of a firearm by a prohibited person. On appeal, McCurry claims, inter alia, that the court erred when it refused his proposed instruction regarding eyewitness identification and when it refused his requested instruction stating that the jury need not unanimously reject a greater offense before considering lesser offenses. He also claims there was not sufficient evidence to support his conviction for first degree murder. We affirm McCurry's three convictions and his life sentence for first degree murder. However, we note that the district court erred when it ordered McCurry's sentence for the use conviction to be served concurrently with his sentence for the possession conviction; we vacate those sentences and remand the cause to the district court for resentencing on those convictions.

## STATEMENT OF FACTS

On June 25, 2014, Timothy Marzettie was shot and killed at his residence in Omaha, Nebraska. Witnesses told police officers investigating the shooting that the shooting occurred during a home invasion by two intruders. Investigators identified McCurry as a suspect in the shooting, and McCurry was arrested on June 29. The State charged McCurry with first

degree murder and use of a firearm to commit a felony; the State later added a charge of possession of a firearm by a prohibited person.

At McCurry's trial, the State presented evidence, including testimony by police officers and forensic analysts who participated in the investigation of the shooting. Other witnesses included a woman who was babysitting her grandson in the house next door to Marzettie's on June 25, 2014. She testified that late that night, she was on an enclosed porch smoking a cigarette when she saw a car pull up and stop in front of Marzettie's house. Three men got out of the car, and the witness saw them lift the hood of the car. She saw one of the men urinating in the bushes, while the other two men walked up the driveway to Marzettie's house. The witness later heard a woman screaming, a baby crying, and a single gunshot; the car left after the gunshot was fired. The witness testified that the incident happened quickly and that she heard the gunshot approximately 5 minutes after the car pulled up. She did not identify the men beyond describing them as "three black males"; she described the car as a "[f]our-door, smaller car" that was "dark-colored," possibly maroon red.

The main witnesses for the State were three women: Patricia Riley, Jessica Simpson, and Cherita Wright. Riley and Simpson were both in Marzettie's house at the time of the shooting. Wright was not in the house at the time, but she knew both McCurry and Marzettie, and she testified regarding interactions between the two men.

*Patricia Riley's Testimony.*

Riley testified that she lived with Marzettie and that she was pregnant with his child at the time that he was killed. In addition to having an intimate personal relationship with Marzettie, Riley worked for him as a prostitute. She described Marzettie as a "pimp," and she testified that other women had worked for Marzettie, including Wright, with whom Riley had become friends.

On the night of June 25, 2014, Riley was at the house with Marzettie. Also in the house were Marzettie's infant daughter from another woman and Simpson; Riley had first met Simpson a few days earlier. Riley and Marzettie were in the living room of the house with his daughter, and Simpson was outside the front of the house smoking a cigarette. Riley heard a voice from outside the front of the house, and when Marzettie walked outside to see who was speaking to Simpson, Riley heard someone asking "where is Cherita?" Riley could not see the person who was speaking, but she saw a "dark car" parked in front of the house. Riley went outside to get Marzettie's daughter, who was with Marzettie. She testified that Marzettie and another man were "kind of arguing back and forth" and that Marzettie was telling the man that "Cherita was not there." Riley did not immediately get a good look at the other man because she was focused on getting the child inside, but she "noticed that it was a black male with dark clothing."

After Riley put the child down in a portable crib in a bedroom, she returned to the living room. Marzettie and the other man were still "going back and forth" about the whereabouts of "Cherita." The other man stated that he had dropped "Cherita" off at the house earlier in the day and that she had called him to come and pick her up. Riley testified that "Cherita was not there" and that "[s]he hadn't been there in months." Marzettie came into the house saying that he was going to get his cell phone so that he could make a call to prove that "Cherita" was not there.

Riley testified that before Marzettie could go back outside, the other man "pulled the gun out and came in the house after him." The man pointed the gun at Marzettie, and Marzettie said that he did not know where "Cherita" was. While Marzettie was telling the man to leave, another man ran into the house and grabbed Marzettie and pushed him onto a couch. Riley tried to pull the second man off Marzettie, but Simpson pulled Riley off the man, because Riley was 9 months' pregnant. Riley then went to a bedroom in order to call the 911 emergency

dispatch service and to calm Marzettie's daughter, who had begun crying. While Riley was on her cell phone with the dispatcher, she heard a gunshot. She then heard Simpson pounding on the bedroom door and telling Riley "to open the door because they shot him." Riley went out to the living room and saw Marzettie "laying [sic] on the floor face down holding his chest." The two men who had come into the house were gone, and police officers arrived at the house soon thereafter.

Regarding her observation of the intruders, Riley testified that the man with the gun was wearing a "[b]lack shirt . . . dark pants and a hat, a black hat." Riley "didn't really see [the] face" of the second man who came in, but she saw he was wearing blue jeans and a red shirt with "some white detail on the shirt." Riley testified that both men were black. Riley stated that she was "[m]aybe two arms' lengths" away from the man with the gun when she observed him in the living room. Riley also testified that she had seen a third person standing outside the house by the "dark red maroon" car but that the third person did not come inside the house and she "couldn't see that far down to tell anything about the person."

The State asked Riley, "[T]he party in all black that came into the residence that night that you saw with the gun, do you see him here in the courtroom today?" Riley replied that she did, and she then identified McCurry. The State asked Riley whether she had ever seen McCurry before that night. She replied that "[a] couple of weeks before that" she had "ran into him and [Wright] outside" a hotel. Riley spoke with Wright because "she was a friend." During the conversation with Wright, Riley had a brief exchange with McCurry who was an "arm's length or so away" from her. McCurry told Riley that she "should basically leave [her] baby's dad alone and just to fuck with him." Riley "just kind of laughed it off and shrugged it off." Riley testified that she believed that the time at the hotel was the first time that she had met McCurry.

On cross-examination, Riley admitted that she had originally told police that the first time she met McCurry was at

a restaurant rather than at a hotel. She testified that she lied to the police about the location because she was engaging in prostitution at the hotel and was afraid she would get herself into trouble if she told the police the truth of the location. Riley also admitted that her interaction with McCurry at the hotel lasted only a few minutes and that she was trying to ignore him most of that time.

On further cross-examination, Riley admitted that during the 911 call, she was asked if she knew who had fired the gunshot and she said she did not know. She also acknowledged that in a pretrial deposition, she had testified that on the night of the shooting, she did not recognize either of the intruders. Riley further acknowledged that after the shooting but before she went to be interviewed by investigators, she tried to contact Wright by telephone and through her Facebook page. She also looked at Wright's Facebook page to see if she could determine the identity of the man who had come to the house looking for Wright. Riley testified that after she had talked with police, Marzettie's adult son had shown her a picture of McCurry that he had found on Facebook and "asked if it was him." Riley did not testify as to her response.

On redirect, Riley testified that although she did not immediately recognize the two men who came into the house, the man with the gun looked familiar and that she "knew [she] had seen his face before but just couldn't put a name with the face."

*Jessica Simpson's Testimony.*

Simpson testified that she had become acquainted with Marzettie in 2010 or 2011. In June 2014, she came to Omaha to retrieve a vehicle and visit family. While in Omaha, she contacted Marzettie and eventually ended up staying at his house. Simpson was at the house on the night of June 25. Around 10:30 p.m., she went outside to smoke a cigarette. Simpson saw a "[d]ark four-door sedan" pull up and park at the end of the driveway. The driver rolled down his window

and asked for "Cherita." Simpson did not recognize the name, so she spoke to Marzettie through a window and asked him "who Cherita was." Marzettie came outside, and the driver and a back seat passenger got out of the vehicle. Simpson did not recognize either person, but she described them as "black males." Simpson saw another passenger in the front seat, but she did not see him get out of the vehicle. The back seat passenger stayed by the vehicle, while the driver walked toward the house, "asking for Cherita, saying to tell Cherita to come out."

When Riley came outside to get Marzettie's daughter, Simpson went inside with Riley. Simpson stayed in the front of the house, while Riley went to the bedroom to put the child down in the portable crib. Marzettie came inside to get his cell phone and tried to make a call, but did not appear to get an answer. Marzettie yelled out the door that "Cherita" was not there. The driver of the car came inside, and Simpson saw that he was carrying a gun in his hand. She also noted that he was wearing "[a]ll black . . . [b]lack jeans, black T-shirt, black hat." Simpson testified that he and Marzettie were arguing and that she saw Marzettie run from him.

Simpson testified that the back seat passenger, who was wearing "[b]lack jeans, red shirt, red hat," came inside the house and that he and the driver punched Marzettie. Simpson saw Marzettie being pushed down on a couch and heard him "begging not to get shot." During the confrontation, Simpson heard the driver ask Marzettie "if he remembered getting into it with him at the club." At one point, the passenger left the house and Marzettie stood up and pushed the gun out of the driver's hand. The gun flew near Simpson, and she moved away. The driver was able to retrieve the gun before Marzettie could reach it. Simpson then saw the driver point the gun, and she heard a gunshot. After the gunshot, Simpson saw the driver run out of the house, closing the door behind him. Simpson saw Marzettie fall to the floor, and she ran to the bedroom to get Riley. The door was closed, so Simpson

banged on the door and told Riley, who was on her cell phone with the police, to come out. The two women went to tend to Marzettie, and Simpson saw that he had a gunshot wound to his chest.

During cross-examination, Simpson testified that the first statement she gave regarding the shooting was when she was questioned by detectives at the police station. In response to questioning by McCurry, Simpson stated that detectives had shown her photographs of individuals. The State objected when McCurry asked Simpson, "[D]id you identify anyone?" The State argued in a sidebar to the bench that it was not permissible to ask questions about photographic lineups, and McCurry argued in response that Simpson's expected testimony—that she was not able to identify anyone—was not hearsay. The court sustained the State's objection but allowed McCurry to make an offer of proof outside the jury's presence.

In the offer of proof, McCurry offered a photographic lineup spread of six individuals, one of whom was McCurry, and he alleged that the photographs were shown to Simpson. McCurry claimed that Simpson would testify that she was not able to identify anyone from the photographic lineup but that she said that one of the men, who was not McCurry, looked familiar. After the offer of proof and further argument, the court again sustained the State's objection. The court noted that the evidence may have been permissible to impeach Simpson's credibility if Simpson had identified McCurry as the man who shot Marzettie, but that the State had not asked Simpson to identify McCurry. After the offer of proof and the court's ruling, McCurry resumed his cross-examination of Simpson before the jury. During the cross-examination, McCurry asked Simpson, "[Y]ou have been unable to identify anyone who was in that house at that time, other than . . . Marzettie and the people you already know; is that true?" Simpson replied, "That's true, correct."

Later in the trial, the State called as a witness an officer who had questioned Simpson at the police station. During

cross-examination of the officer, McCurry made another offer of proof to the effect that the officer would testify that he had shown Simpson the photographic lineup and that she was unable to identify McCurry, but thought that one of the other men looked familiar. The State objected based on hearsay and relevance, and the court again determined that the evidence was inadmissible.

*Cherita Wright's Testimony.*

Wright testified that she met McCurry at a strip club where she worked. She developed an arrangement with McCurry wherein he provided transportation and use of a cell phone to assist her in pursuing work as a prostitute. Wright testified that the arrangement had started "maybe a month or two" before June 25, 2014, and that in that time, she and McCurry developed a friendship and a casual sexual relationship. She testified that one of the vehicles he used to transport her was a "maroon four-door car."

During Wright's testimony regarding her relationship with McCurry, the State asked, "[I]n the times you're spending with . . . McCurry, did you ever have the occasion to see him with a firearm?" McCurry objected before Wright could answer. In a sidebar, McCurry moved for a mistrial. He argued that because McCurry was a felon, his possession of a firearm was a crime, and that therefore, evidence he had a firearm was evidence of other crimes under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016). McCurry argued that because the State had not requested a hearing as required under rule 404, the evidence was not admissible and the State's attempt to elicit such evidence required declaration of a mistrial. The State argued in response that the evidence was relevant to the present crime, because Wright would testify that a couple weeks prior to June 25, 2014, she had seen McCurry with a gun and that he had put it under the hood of the maroon car. After considering the arguments, the court sustained McCurry's objection to the question but overruled his motion for mistrial.

The court instructed the jury to disregard the State's previous question and to not speculate as to the answer.

Wright further testified that she had met Marzettie in 2009 or 2010 and that she had worked for him as a prostitute "off and on through the years." Wright's arrangement with Marzettie was that he "ran the show," meaning she gave him the money she earned while he "controlled" and "set up everything." Wright testified that during the time she knew Marzettie, the two occasionally had an "intimate relationship" and that she would sometimes stay at his house. She testified that she would be at Marzettie's house "[s]ometimes . . . once a week or twice" and "[s]ometimes I didn't go over for months at a time." Wright came to know and become friends with Riley through Marzettie, and at one time, she had lived in the house with Marzettie and Riley.

Wright testified that 2 or 3 weeks before June 25, 2014, she and McCurry went drinking at a strip club in Council Bluffs, Iowa. While at the strip club, she saw and spoke with Marzettie. Wright testified that Marzettie and McCurry "got into an altercation" and that she "was in the middle of it." After the altercation, Wright left the strip club with Marzettie and he took her to a hotel, where they spent the night together.

Wright testified that sometime after the altercation at the strip club, but before June 25, 2014, McCurry drove her to a hotel where she was to engage in prostitution. While at the hotel, she ran into Riley and the two of them had a conversation which lasted "probably five minutes." Wright testified that McCurry was present during at least part of her conversation with Riley.

Wright testified that on the morning of June 25, 2014, she had McCurry drive her to see Riley; she had planned to see Riley the night before, but decided to put it off until the morning because she was "too drunk." Wright asked McCurry to drop her off at a corner near the house in which Riley lived with Marzettie. She testified that she had McCurry drop her off down the street from Marzettie's house, because she wanted

to avoid any contact between McCurry and Marzettie. After McCurry drove away, Wright knocked on the door of the house but no one was home. Wright left and got a ride with a "random white man" to her aunt's house. Wright stayed at her aunt's house until that evening when her cousin got off work and took Wright to her house. Wright called McCurry, and he told her that "an altercation had went down again" between McCurry and Marzettie. McCurry said that Marzettie "had gotten got" but that McCurry did not want to talk about it over the telephone and he ended the call after a couple of minutes. Wright spoke with McCurry again in the early morning hours of the next day and he told her that "he got into it with [Marzettie] and that they got him" but that "it really had nothing to do with" Wright. McCurry asked Wright whether Riley knew McCurry's name, and he told Wright to tell Riley "to be quiet." During cross-examination, Wright testified that during the call, she "asked [McCurry] who did it, and he just said one of his homies."

*Other Evidence.*

The State presented further evidence, including evidence that after McCurry was arrested, police officers executed a search warrant at the residence where McCurry had been staying. Among the items found during the search was a plastic bag that contained, inter alia, a black shirt, dark jean shorts, and McCurry's driver's license. A black hat was found in the search.

The State's evidence also included recordings of telephone calls McCurry made while he was in jail. In the recordings, McCurry stated, inter alia, that he had gone to a house looking for "the girl, Cherita," that he had earlier dropped "Cherita" off near that house, and that the house was the house of a "guy [he] already had fought . . . like 3 or 4 weeks ago at the club."

*Jury Instructions.*

At the jury instruction conference, McCurry offered an instruction regarding eyewitness identification testimony. The

full text of McCurry's proposed instruction is set forth in the analysis section below. The court refused McCurry's proposed instruction regarding eyewitness identification testimony.

McCurry objected to a portion of the court's instruction regarding the elements of the murder charge. The court's instruction was a "step instruction" based on NJI2d Crim. 3.1, and a section of the instruction titled "Effect of Findings" provided that the jury must "separately consider in the following order" the crimes of first degree murder, second degree murder, and manslaughter. McCurry proposed an alternate "Effect of Findings" section which provided, inter alia, that the jury need not be unanimous in rejecting a greater offense before it considered whether the defendant was guilty of a lesser offense. The district court overruled McCurry's objection to its instruction and refused to substitute McCurry's proposed "Effect of Findings" section.

*Conclusion of Trial.*

The jury found McCurry guilty of first degree murder, use of a firearm to commit a felony, and possession of a firearm by a prohibited person. The court sentenced McCurry to life imprisonment for first degree murder, 30 to 50 years' imprisonment for use of a firearm to commit a felony, and 20 to 30 years' imprisonment for possession of a firearm by a prohibited person. The court ordered the sentence for the use conviction to be served consecutively to the life sentence for murder, and it ordered the sentence for the possession conviction to be served concurrently with the sentence for the use conviction.

McCurry appeals his convictions.

## ASSIGNMENTS OF ERROR

McCurry claims that the district court erred when it (1) overruled his motion for mistrial after the State asked Wright if she had ever seen McCurry in possession of a firearm, (2) refused his proposed jury instruction on eyewitness identification, (3) overruled his objection to the step instruction and

refused his requested instruction stating that the jury need not be unanimous in rejecting a greater offense before considering lesser offenses, (4) sustained the State's objection to his proposed evidence to the effect that when Simpson was shown a photographic lineup she was unable to identify McCurry as one of the intruders, and (5) violated his constitutional right to present a complete defense when it refused to admit his proposed evidence regarding Simpson's inability to identify him from a photographic lineup. McCurry also claims that there was not sufficient evidence to support his conviction for first degree murder.

## STANDARDS OF REVIEW

[1] The decision whether to grant a motion for mistrial will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Chauncey*, 295 Neb. 453, ___ N.W.2d ___ (2017).

[2] Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Martinez*, 295 Neb. 1, 886 N.W.2d 256 (2016).

[3,4] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211 (2016). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

[5] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on

hearsay grounds. *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016).

[6] The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

[7] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pester*, 294 Neb. 995, 885 N.W.2d 713 (2016).

## ANALYSIS

*District Court Did Not Abuse Its Discretion*
*When It Overruled McCurry's*
*Motion for Mistrial.*

McCurry first claims that the district court erred when it overruled his motion for mistrial after the State asked Wright if she had ever seen McCurry in possession of a firearm. We conclude that the court did not abuse its discretion when it overruled McCurry's motion for mistrial.

As discussed above, McCurry objected when the State asked Wright whether she had ever seen McCurry in possession of a gun. During a sidebar conference, he also moved for a mistrial. The court sustained McCurry's objection to the question but overruled the motion for mistrial. The court instructed the jury to disregard the State's question and to not speculate as to the answer.

[8,9] A mistrial is properly granted in a criminal case where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper

admonition or instruction to the jury and thus prevents a fair trial. *State v. Chauncey*, 295 Neb. 453, ___ N.W.2d ___ (2017). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id*. However, error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. *Id*.

In the present case, Wright did not answer the State's question; the district court sustained McCurry's objection to the question, and the court instructed the jury to disregard the question and to not speculate as to the answer. McCurry's appellate arguments are essentially a contention that there was a possibility of prejudice. Contrary to McCurry's contention, we believe that the court's admonishment was sufficient to overcome any potential prejudice resulting from the State's question, and we therefore conclude that the court did not abuse its discretion when it overruled McCurry's motion for mistrial.

### District Court's Refusal of McCurry's Proposed Eyewitness Identification Instruction Was Not Reversible Error.

McCurry next claims that the district court erred when it refused his proposed jury instruction on eyewitness identification. We conclude that the court's refusal of the instruction was not reversible error.

At the jury instruction conference, McCurry offered an instruction regarding eyewitness identification testimony. The proposed instruction provided as follows:

> The value of identification testimony depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

> In evaluating such testimony you should consider all of the factors mentioned in these instructions concerning your assessment of the credibility of any witness, and

you should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time of the offense. You may consider, in that regard, such matters as the length of time the witness had to observe the person in question, the prevailing conditions at that time in terms of visibility or distance and the like, and whether the witness had known or observed the person in earlier times.

You should also consider whether the identification made by the witness after the offense was the product of the witness's own recollection. You may consider, in that regard, the strength of the identification, and the circumstances under which the identification was made, and the length of time that elapsed between the occurrence of the crime and the next opportunity the witness had to see [McCurry].

You may also take into account that an identification made by picking [McCurry] out of a group of similar individuals is generally more reliable than one which results from the presentation of [McCurry] alone to the witness.

If the identification by the witness may have been influenced by the circumstances under which [McCurry] was presented to the witness for identification, you should scrutinize the identification with great care.

You may take into account any occasions in which the witness failed to make an identification of [McCurry], or made an identification that was inconsistent with her identification at trial.

The court refused McCurry's proposed instruction.

The court gave the following instruction with regard to witness credibility:

You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In determining the weight which the testimony of the witnesses is entitled to receive, you should consider:

1. Their interest in the result of the suit, if any;

2. Their conduct and demeanor while testifying;

3. Their apparent fairness or bias or relationship to the parties, if any such appears;

4. Their opportunity for seeing or knowing the things about which they have testified;

5. Their ability to remember and relate accurately the occurrences referred to in their evidence;

6. The extent to which they are corroborated, if at all, by circumstances or the testimony of credible witnesses;

7. The reasonableness or unreasonableness of their statements;

8. Evidence of previous statements or conduct inconsistent with their testimony at this trial; and

9. All other evidence, facts, and circumstances proved tending to corroborate or contradict such witnesses.

McCurry argues on appeal that the court's refusal to give his proposed instruction regarding eyewitness identification was reversible error, because the identity of the person who shot Marzettie was a crucial issue in this case.

[10] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Rothenberger*, 294 Neb. 810, 885 N.W.2d 23 (2016). In this case, we need not determine whether McCurry's tendered instruction is a correct statement of the law, because we determine that based on the evidence in this case, the instructions given by the court were adequate and McCurry was not prejudiced by the court's refusal to give his proposed instruction on eyewitness identification.

The only eyewitness in this case who identified McCurry was Riley. Simpson was also an eyewitness and was able to describe the person who shot Marzettie; however, she did

not identify McCurry as that person and she admitted that she had been unable to identify the persons who came into Marzettie's house. Therefore, Riley is the only witness to whom McCurry's proposed instruction regarding eyewitness identification might apply.

In *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012), we recognized precedent of other courts to the effect that it is reversible error to refuse to give an eyewitness identification instruction where the government's case rests solely on questionable eyewitness identification. However, in *Freemont*, we determined that a proposed eyewitness identification instruction was not warranted by the evidence, because identifying witnesses knew the defendant, there was no indication of racial bias in their identifications, and the identifications were corroborated by other witnesses and by circumstantial evidence. We further determined in *Freemont* that the defendant could not establish prejudice as a result of the court's refusal of the proposed instruction, because the court gave a general witness credibility instruction which "was sufficient to protect against any prejudice related to the reliability of the eyewitness identifications." 284 Neb. at 201, 817 N.W.2d at 296.

The present case differs from *Freemont* in that there were no other eyewitness identifications to corroborate Riley's identification of McCurry and Riley's identification of McCurry was based on having met him once for a short time rather than from having known him well. However, McCurry does not assert that Riley had difficulty identifying McCurry due to racial differences or that the evidence indicates that Riley was identifying a person she had never seen before; cross-racial identification and identification of a stranger are concerns typically addressed by eyewitness identification instructions like the one proposed by McCurry.

We also note that although Riley's identification of McCurry was not explicitly corroborated by other eyewitnesses, there was circumstantial evidence to corroborate

her identification; such circumstantial corroborating evidence includes Simpson's description of the person who shot Marzettie and the clothes the person was wearing and the recording of McCurry's telephone calls from jail in which McCurry indicated that he had gone to Marzettie's house looking for Wright. This case does not require us to adopt an eyewitness identification instruction, and instead, we conclude that the general credibility instruction given by the court adequately addressed the issues. For example, the jury was instructed to determine witness credibility by considering, inter alia, the witnesses' "opportunity for seeing or knowing the things about which they have testified" and the "extent to which they are corroborated, if at all, by circumstances or the testimony of credible witnesses." McCurry's concerns were adequately met, because as illustrated, the jury was instructed to consider Riley's basis for identifying McCurry as well as the corroboration or lack of corroboration by other eyewitness identifications when determining whether her identification testimony was credible.

Based on the evidence and the general witness credibility instruction given in this case, McCurry has not shown that he was prejudiced by the court's refusal of his proposed eyewitness identification instruction. We therefore conclude that the court's refusal of the instruction was not reversible error, and we reject this assignment of error.

*District Court's Use of Step Instruction and Refusal of McCurry's Proposed Alternate Instruction Was Not Reversible Error.*

McCurry next claims that the district court erred when it overruled his objection to the court's step instruction and refused his proposed instruction stating that the jury need not acquit McCurry of the greater offense before considering lesser offenses. We conclude that the court's use of its instruction and refusal of McCurry's requested instruction were not reversible error.

McCurry objected to the "Effect of Findings" portion of the district court's instruction regarding the elements of the murder charge. The court's instruction was based on NJI2d Crim. 3.1, and the "Effect of Findings" portion of the instruction given by the court provided as follows:

You must separately consider in the following order the crimes of Murder in the First Degree, Murder in the Second Degree, and Manslaughter. For Murder in the First Degree, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find [McCurry] guilty of Murder in the First Degree and stop. If you find that the State did not so prove, then you must proceed to consider the next crime in the list, Murder in the Second Degree. You must proceed in this fashion to consider each of the crimes in sequence until you find [McCurry] guilty of one of the crimes or find him not guilty of all of them.

McCurry proposed an alternate "Effect of Findings" section which concluded with the following: "Although your final verdict must be unanimous, during your preliminary deliberations and discussions, you are not required to be unanimous before considering whether [McCurry] is guilty of a lesser offense (i.e. murder in the second degree, intentional manslaughter or unintentional manslaughter)." The court overruled McCurry's objection to its instruction and refused to substitute McCurry's proposed "Effect of Findings" section.

McCurry asserts that one of his defenses in this case was that even if the jury found that he killed Marzettie, the act was manslaughter rather than murder because it was the result of a sudden quarrel provocation. He argues that it was therefore crucial to his defense that the jury consider whether the killing was manslaughter, that is, whether it occurred upon a sudden quarrel, rather than first or second degree murder. He argues that because the instruction required the jury to find that he was not guilty of first degree murder before it could consider

whether he was guilty of a lesser offense, such as intentional manslaughter, the jury could find him guilty of first degree murder without having considered whether the killing occurred upon a sudden quarrel.

We considered and rejected a similar argument in *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211 (2016). In *Hinrichsen*, the court determined that when finding the defendant guilty of first degree murder, the jury found beyond a reasonable doubt that the defendant acted with deliberate and premeditated malice and that "the jury necessarily simultaneously found beyond a reasonable doubt that there was no sudden quarrel provocation, i.e., that [the defendant] did not act without due deliberation and reflection." 292 Neb. at 633, 877 N.W.2d at 227. The court concluded that the "crucial question of whether [the defendant] acted with deliberate and premeditated malice, or instead acted without due deliberation and reflection, was very much presented to the jury even if the jury was not directly instructed that sudden quarrel provocation negates malice." *Id*. at 633-34, 877 N.W.2d at 227. Although the court rejected the defendant's contentions in *Hinrichsen*, we stated that in future first degree murder cases in which evidence of provocation has been adduced by a defendant, courts should clarify the definition of "deliberate" by explicitly stating that "'[a]n act is not deliberate if it is the result of sudden quarrel provocation.'" 292 Neb. at 636, 877 N.W.2d at 228. We note that the present case was tried before the decision in *Hinrichsen* was filed.

Although the decision in *Hinrichsen* forecloses McCurry's argument, we add the further observation that there was no evidence which would warrant an instruction on provocation. The testimony of witnesses regarding how the shooting of Marzettie occurred indicated that the shooter and another person came into the house and fought with Marzettie for some time before the shooting, that the altercation started outside the house, and that the shooter was carrying a gun when he entered the house. McCurry notes evidence that Marzettie knocked

the gun out of the shooter's hand and that the shooter shot Marzettie after retrieving the gun. McCurry suggests that the facts after the gun was knocked out of the shooter's hand represent a new incident. We reject this suggestion. The evidence does not show that a sudden quarrel began when Marzettie knocked the gun out of the shooter's hand, but, instead, that occurrence was part of an ongoing altercation. We determine that there was no evidence that would have established sudden quarrel provocation in this case.

We conclude that the court did not err when it refused McCurry's alternate "Effect of Findings" instruction, which was designed to advise the jury to consider lesser offenses, one of which includes the concept of sudden quarrel provocation. Based on the reasoning in *Hinrichsen*, McCurry was not prejudiced by the refusal, because the jury necessarily rejected sudden quarrel provocation when it found him guilty of first degree murder. McCurry was not prejudiced by refusal of the instruction, because there was no evidence in this case that McCurry was provoked into killing in the manner he did and the evidence in this case did not warrant McCurry's proposed instruction designed to focus the jury on provocation. We reject this assignment of error.

*District Court Did Not Err When It Sustained*
*Hearsay Objection to Evidence Regarding*
*Simpson's Failure to Identify McCurry*
*in a Photographic Lineup.*

McCurry next claims that the district court erred when it sustained the State's objection to McCurry's proposed evidence to the effect that when Simpson was shown a photographic lineup, she was unable to identify McCurry as one of the intruders. We conclude that the court did not err when it sustained the State's objection based on hearsay.

Simpson testified on cross-examination that detectives had shown her photographs of individuals. The State objected when McCurry asked Simpson, "[D]id you identify anyone?" The

court sustained the State's objection but allowed McCurry to make an offer of proof outside the jury's presence. McCurry made an offer of proof to the effect that, if permitted, Simpson would testify that she was shown a photographic lineup and that she was not able to identify anyone from the lineup, but that she said one of the men, who was not McCurry, looked familiar. The court again sustained the State's objection, and the court noted that the evidence may have been permissible to impeach Simpson's credibility if Simpson had identified McCurry. In later cross-examination, McCurry asked Simpson, "[Y]ou have been unable to identify anyone who was in that house at that time, other than . . . Marzettie and the people you already know; is that true?" Simpson replied, "That's true, correct."

Later in the trial, the officer who had questioned Simpson at the police station testified. During cross-examination of the officer, the State objected and McCurry made another offer of proof to the effect that the officer would testify that he had shown Simpson the photographic lineup and that she was unable to identify McCurry but thought that one of the others looked familiar. The State again objected based on hearsay and relevance, and the court again determined that the proposed cross-examination evidence was inadmissible.

[11] In ruling that the evidence was inadmissible, the district court cited *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012), and *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992). In *Scott*, we cited *Salamon* for the proposition that "testimony regarding an out-of-court identification is hearsay." 284 Neb. at 718, 824 N.W.2d at 684. In *Salamon*, we compared Nebraska hearsay rules to federal rules of evidence and stated as follows:

[W]hile federal Rule 801(d)(1)(C) classifies a witness' pretrial identification as a nonhearsay statement, Nebraska Rule 801(4)(a)[, Neb. Rev. Stat. § 27-801(4)(a) (Reissue 2016),] does not contain such classification and provision and, in fact, makes no mention whatsoever

concerning witness identification as a nonhearsay state-
ment. None of the other Nebraska Rules of Evidence or
other Nebraska statutes authorize admissibility of a wit-
ness' pretrial identification of a defendant as a nonhearsay
statement or statement otherwise exempted or excluded
from the operation and purview of the "hearsay rule,"
Rule 802, [see Neb. Rev. Stat. § 27-802 (Reissue 2016),]
prohibiting admission of hearsay. Consequently, in the
absence of admissibility authorized under the Nebraska
Evidence Rules or by other statute, a witness' pretrial
statement identifying a defendant as the perpetrator of a
crime is hearsay pursuant to Rule 801(3) and, therefore, is
inadmissible as the result of Rule 802. This is not to say
that a witness' pretrial identification of a defendant may
never be admissible. Never say never. A witness' pretrial
identification may be admissible in certain circumstances
encompassed within the Nebraska Evidence Rules, for
example, for the purpose of impeachment. See Neb. Evid.
R. 613[, Neb. Rev. Stat. § 27-613 (Reissue 2016)]. . . .
Whether Rule 801(4)(a) is amended to authorize admis-
sibility of a witness' pretrial identification of a defendant
remains to be seen and is a legislative matter involving
the Nebraska Evidence Rules.

241 Neb. at 890-91, 491 N.W.2d at 698. We note that since
*Salamon* was decided in 1992, the Legislature has not amended
Neb. Evid. R. 801(4)(a), Neb. Rev. Stat. § 27-801(4)(a) (Reissue
2016), in order to classify a witness' pretrial identification as a
nonhearsay statement.

McCurry argues that the present case is distinguishable from
*Salamon* and *Scott*, because in those cases, the out-of-court
statement was offered to prove the truth of the matter asserted;
that is, the person who was identified was the perpetrator of
the offense. He argues that in the present case, he was not try-
ing to prove the truth of an assertion, but, instead, was trying
to show that Simpson "made no identification of him as being
at the scene" and that, instead, she "tentatively identified a

different person in the photo spread." Brief for appellant at 33. McCurry's argument is unconvincing.

In his offer of proof, the record shows that McCurry sought to put before the jury evidence that when Simpson was shown the photographic lineup, she made the statements that she was not able to identify any of the men as the shooter and that she thought one of the other men looked familiar. Thus, inherent in McCurry's own argument, he was attempting to prove the truth of these statements; that is, Simpson was not able to identify McCurry and she thought another man looked familiar.

It follows that the evidence McCurry sought to offer was hearsay and that characterization of the evidence as a witness' pretrial identification, or nonidentification, did not remove the evidence from being treated as hearsay under Nebraska law. Further, as the district court noted, the evidence was not admissible for purposes of impeachment, because during her testimony, Simpson did not make an in-court identification of McCurry and, therefore, there was no need to impeach an identification. We conclude that the district court did not err when it determined that the evidence McCurry sought to put before the jury was inadmissible under Nebraska hearsay law. We reject this assignment of error.

*District Court Did Not Violate McCurry's Constitutional
Rights When It Sustained Objection to Evidence
Regarding Simpson's Failure to Identify
McCurry in a Photographic Lineup.*

McCurry claims that even if the evidence regarding Simpson's failure to identify him from a photographic lineup was inadmissible under Nebraska hearsay law, the district court violated his due process and compulsory process rights and his right to present a complete defense when it refused to admit such evidence. We reject this claim.

[12] We have stated that whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the

federal Constitution guarantees criminal defendants a mean-ingful opportunity to present a complete defense. *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015). However, the accused does not have an unfettered right to offer testi-mony that is incompetent, privileged, or otherwise inadmis-sible under standard rules of evidence. *Id*. As we concluded above, the district court did not err when it concluded that the evidence regarding Simpson's failure to identify him from a photographic lineup was inadmissible as hearsay under Nebraska's standard rules of evidence.

McCurry notes that in *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), the U.S. Supreme Court stated that while state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials, the defendant's right to present a complete defense is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve. McCurry asserts that Nebraska is one of only two states that does not follow the federal rules by classifying a witness' pretrial identification as a nonhearsay statement. He argues that "in light of the . . . overwhelming number of jurisdictions that allow evidence of pretrial identification, the absence of this exception to the hearsay rule is an arbitrary evidentiary rule" and that therefore, under *Holmes*, the appli-cation of Nebraska's evidentiary rule in this case abridged his constitutional right to present a complete defense. Brief for appellant at 36.

We disagree. The fact that Nebraska's rule on this subject is not in accordance with the majority of other jurisdictions does not in and of itself make the rule arbitrary or disproportionate to the purposes such rules are designed to serve. Furthermore, as we noted in *State v. Salamon*, 241 Neb. 878, 491 N.W.2d 690 (1992), "[w]hether Rule 801(4)(a) is amended to autho-rize admissibility of a witness' pretrial identification of a defendant . . . is a legislative matter"; since *Salamon* was

decided in 1992, the Legislature has chosen not to change the rule to conform to other jurisdictions.

We further note that the application of this rule of evidence in this case did not abridge McCurry's right to present a complete defense, because he was not prevented from arguing to the jury that Simpson had witnessed the shooting but was unable to identify McCurry as the shooter. As noted above, Simpson never identified McCurry and, on cross-examination, McCurry was able to elicit testimony from her to the effect that she had not been able to identify the persons who came into Marzettie's house that night. Simpson's nonidentification was in evidence. Therefore, to the extent the fact that Simpson was unable to identify McCurry as being the perpetrator was important to his defense, he was not prevented from arguing it to the jury.

McCurry's right to a meaningful opportunity to present a complete defense did not entitle him to present evidence that was otherwise inadmissible under standard rules of evidence, including hearsay rules. Furthermore, exclusion of the specific evidence at issue did not prevent McCurry from presenting a defense based on Simpson's failure to identify him. We therefore conclude that the district court did not violate McCurry's constitutional rights when it ruled the evidence inadmissible. We reject this assignment of error.

*There Was Sufficient Evidence to
Support McCurry's Conviction
for First Degree Murder.*

In his final assignment of error, McCurry claims that there was not sufficient evidence to support his conviction for first degree murder. McCurry does not argue that there was not sufficient evidence for the jury to find that he killed Marzettie; instead, he argues that manslaughter is the highest degree of homicide the evidence in this case supports. We conclude that, viewing the evidence in the light most favorable to the prosecution as we must, see *State v. Pester*, 294 Neb. 995,

885 N.W.2d 713 (2016), there was sufficient evidence from which the jury could have found McCurry guilty of first degree murder.

McCurry argues that testimony given by the eyewitnesses, Riley and Simpson, described "a sudden quarrel that erupted between the intruders and the deceased." Brief for appellant at 38. He claims that an argument ensued between the intruders and Marzettie after the intruders entered the house and "one of the intruders introduced a gun into the altercation." *Id.* at 39. He also states the evidence shows that neither Riley nor Simpson saw the actual shooting and that Simpson testified that the shooter and Marzettie "scrambled to gain possession" of the gun after it landed on the floor. *Id.* at 38.

We disagree with McCurry's characterization of the evidence. We first note that there was sufficient evidence to identify McCurry as the person who shot Marzettie. In the telephone calls McCurry made while he was in jail, he stated that he had gone to a house looking for "Cherita," that he had earlier dropped her off near the house, and that the house was the house of a "guy [he] already had fought . . . like 3 or 4 weeks ago at the club." This was consistent with the testimony of Wright and others to the effect that McCurry had been in a fight with Marzettie at a club, that McCurry had dropped Wright off near Marzettie's house earlier on the day of the shooting, and that one of the people who intruded into Marzettie's house said he was looking for "Cherita." Although neither Riley nor Simpson said they actually saw the shooting as it happened, Simpson testified that she saw one of the intruders pointing the gun at Marzettie immediately before the shot was fired. Simpson's description of the shooter and the clothes he wore matched the description given by Riley of the intruder she identified as McCurry. The description of the clothing also matched the description of clothing found in a search of the residence where McCurry had been staying; several items of the clothing were found in a plastic bag that also contained McCurry's driver's license.

Given the foregoing, there was sufficient evidence for the jury to find that McCurry killed Marzettie purposely and with deliberate and premeditated malice. Contrary to McCurry's claim that the evidence showed that the altercation did not start until the men were inside the house, Riley testified that Marzettie and another man were "kind of arguing back and forth" when they were still outside and that after Marzettie came into the house, the other man "pulled the gun out and came in the house after him" and pointed the gun at Marzettie. Simpson also testified that the man was carrying a gun in his hand when he entered the house. Simpson testified as follows: She heard the man and Marzettie arguing; she saw Marzettie run from him; she heard Marzettie "begging not to get shot"; she heard the other man ask Marzettie "if he remembered getting into it with him at the club"; after Marzettie knocked the gun out of the man's hand, she saw the man retrieve the gun before Marzettie could reach it; and she saw the man point the gun at Marzettie right before she heard a gunshot.

As we noted above in connection with McCurry's claim regarding the "Effect of Findings" section of the elements instruction, the evidence did not support a finding of a sudden quarrel provocation. Reminiscent of our earlier discussion, McCurry again contends that the evidence shows a sudden quarrel that erupted inside the house and that involved a struggle over a gun. To the contrary, testimony by Riley and Simpson indicated that the altercation had been going on for some time before the shooting, that the shooter had the gun in hand when he entered the house, and that Marzettie was running from the other man and begging not to be shot. We determined above that, although there was evidence that Marzettie knocked the gun out of the man's hand, the context of such evidence does not indicate that this act provoked a sudden quarrel, but, instead, that it was part of an ongoing altercation. In addition, Simpson's testimony that the other man asked Marzettie "if he remembered getting into it with him at the club" would indicate that the present altercation and shooting

was a continuation of or the result of that earlier confrontation and did not come up suddenly.

In sum, the evidence noted above supported a finding that McCurry shot and killed Marzettie purposely and with deliberate and premeditated malice. Viewing the evidence in the light most favorable to the prosecution, the evidence supported the jury's finding that McCurry was guilty of first degree murder. We reject this assignment of error.

*District Court Erred When It Ordered McCurry's Sentence for the Use Conviction and His Sentence for the Possession Conviction to Be Served Concurrent With One Another.*

As a final matter, we note error in the district court's sentencing which requires us to vacate the sentences and remand the cause to the court for resentencing. As noted above, the court ordered McCurry's sentence for use of a firearm to commit a felony to be served consecutively to his life sentence for murder, and it ordered McCurry's sentence for possession of a firearm by a prohibited person to be served concurrently with his sentence for the use conviction. We conclude that the court erred when it ordered the sentence for the possession conviction to be served concurrently with the sentence for the use conviction.

[13] McCurry was convicted of use of a firearm to commit a felony pursuant to Neb. Rev. Stat. § 28-1205(1) (Reissue 2016). Section 28-1205(3) provides, "The crimes defined in this section shall be treated as separate and distinct offenses from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed." We have held that § 28-1205(3) mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrently with no other sentence. Under the plain language of § 28-1205, the court must order a sentence for use of a firearm to run consecutively to a sentence for the

underlying felony offense and the sentence for use may not run concurrently to any other sentence. See *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014). In this case, the court did not have the authority to order McCurry's sentence for use of a firearm conviction to be served concurrently with any other sentence, including his sentence for the possession of a firearm conviction.

[14] An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *State v. Ramirez, supra*. Therefore, we vacate the sentences imposed for the use conviction and the possession conviction on the basis that they were ordered to be served concurrently with one another. We note that we do not vacate the life sentence for first degree murder. We remand the cause with directions to the district court to resentence McCurry such that the sentence for the conviction for use of a firearm to commit a felony runs consecutively to any other sentences imposed and not concurrently with any other sentence.

For completeness, we note that McCurry was convicted of possession of a firearm by a prohibited person pursuant to Neb. Rev. Stat. 28-1206 (Reissue 2016) rather than possession of a firearm in the commission of a felony pursuant to § 28-1205(2). Therefore, on remand, while the court does not have discretion to order the sentence for the possession conviction to run concurrently with the sentence for the use conviction, the court does have discretion to determine whether the sentence for the possession conviction shall be served concurrently with the life sentence for murder or whether it shall be served consecutively to both the sentence for the use conviction and the sentence for the murder conviction.

## CONCLUSION

Having rejected McCurry's assignments of error, we affirm his convictions for first degree murder, use of a firearm to commit a felony, and possession of a firearm by a prohibited

person. We also affirm McCurry's life sentence for first degree murder. However, we note error in the court's sentencing order in which it ordered the sentence for use of a firearm to commit a felony to be served concurrently with another sentence, i.e., possession of a firearm by a prohibited person. We therefore vacate those sentences and remand the cause for resentencing on those convictions in accordance with this opinion.

CONVICTIONS AFFIRMED, SENTENCES AFFIRMED
IN PART AND IN PART VACATED, AND CAUSE
REMANDED FOR RESENTENCING.