IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. AGOK


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

AGOK AROK AGOK, APPELLANT.


Filed December 19, 2017.    No. A-17-200.


Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

Mitchell C. Stehlik, of Lauritsen, Brownell, Brostrom & Stehlik, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.


MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

In 2013, Agok Arok Agok was convicted of terroristic threats and use of a deadly weapon to commit a felony. The district court for Hall County sentenced him to 1 to 2 years' imprisonment for the terroristic threats, and 5 to 8 years' imprisonment for the use of a deadly weapon to commit a felony, and the sentences were to be served concurrently. After 3 years of appeals and motions for postconviction relief, the district court reinstated Agok's right to a direct appeal from his original conviction. In this direct appeal, Agok argues only that his conviction should not have been entered because his trial counsel was ineffective. And the State contends the district court committed sentencing errors that constitute plain error. We affirm Agok's convictions. However, we vacate all sentences and remand the cause for resentencing.

## II. FACTUAL BACKGROUND

Agok's convictions were the result of an incident that took place on August 6, 2012. The victim, David Choul (David), made a report to police that Agok pulled a gun on him and threatened him. Agok was charged by information with two counts: terroristic threats (Count I), a Class IV felony, under Neb. Rev. Stat. § 28-311.01 (Reissue 2008); and use of a deadly weapon (firearm) to commit a felony (Count II), a Class IC felony, under Neb. Rev. Stat. 28-1205(1)(a) and (c) (Reissue 2016). A jury trial was held in April 2013.

David, 32 years old at the time of trial, testified he was born in Sudan, was raised in Ethiopia, and moved to the United States in 2001 with his wife, Mary Khor (Mary); they moved to Grand Island, Nebraska, in 2003. David and Mary had 5 children together after moving to the United States. They separated in 2008, but never divorced.

David said that on August 6, 2012, he and Mary took the children to the doctor's office, but David had to leave the appointment to go to work; his shift was from 4 p.m. to 2:30 a.m. While at work, David tried to call Mary two times, but she never answered. So, at 9:30 p.m., David had a 30-minute break at work and went to Mary's house to see what the doctor had said about the children. When he arrived, he walked into the house and asked his children where Mary was. The children told him she was on the porch at the back of the house. When David went back to the porch, Mary was sitting with Agok (who presented himself to David as "Deng"). (David testified he was not upset Mary was with another man because he and Mary were separated and each had dated other people.) David spoke to Mary in Nuer, his native Sudanese dialect, and asked her what the doctor said about the children. According to David, Agok was upset because David and Mary were speaking in a different language. (Agok testified he speaks Dinka, a different Sudanese dialect, and the two dialects are very different languages). David testified Agok told him (in English) "'don't talk to her like that.'" David told Agok he and Mary were not talking about him. At that point, David and Agok got into an argument.

David said he asked Agok if he wanted to fight, based on the way Agok raised his voice and interfered in David's conversation with Mary, and Agok said he did want to fight. David then said to Agok, "I don't know you, we can't fight when we don't even know each other." There was some back and forth between the two of them, and then Agok said, "'well, let's get it done.'" At that point, Agok left the backyard. David continued to talk to Mary for a little bit and then went around to the front of the house because he had to go back to work.

According to David, he found Agok at the back of his (Agok's) car, which was parked in the driveway; David's car was parked either in the driveway or on the street. According to David, Agok popped his trunk, pulled a small silver gun out, pointed it at David, and said he would blow David's head off. At that time, Agok said "a lot of things" to David. Agok said things like, "'[N]igger, I can blow your head off,'" "'I can shoot you,'" and "'I can kill you.'" David said he responded by saying, "[W]ell, the only thing that I know is now you have the power because you've got the gun, but don't miss me."

David said Mary and the children (ages 5, 8, 9, 10, and 11 at the time of trial) had come outside during the altercation. The children screamed and cried, and the little one ran into the house. Agok pointed the gun around. Mary told Agok to put the gun away and said she was going to call the police. David told her he agreed she should call the police. The altercation ended when

David went to his car to leave. David's two oldest boys, Gatdet Choul (Gatdet) and Choul Choul (Choul), who were crying and upset, ran to David's car and left with him; David said the gun was still in Agok's hand at that time. David took the two children to his mother's house and then went back to work; he arrived back to work on time at the end of his 30-minute break.

David stated that when he got to work, he talked to "Jose" and told him what happened. David thought about calling the police that night, but he did not have his phone. He went to the police department and filed a report the next day, August 7, 2012. David, Gatdet, and Choul were interviewed separately on August 16. On cross-examination, David acknowledged Gatdet and Choul stayed with him from August 6 to 16, when he was required to return them to Mary; there is no explanation as to how or why he was required to return the boys to Mary.

Gatdet, 11 years old at the time of trial, testified he saw Agok (known to him as "Deng") pull a steel pistol out of his trunk and point it at David. Mary told Gatdet to go inside, but Gatdet did not want to, and instead ran to David and left with him; Gatdet said his brother also left with David. Gatdet said that after David dropped the boys off at their grandmother's house, David told her what happened (something David denied doing in his testimony). Gatdet later went to the police station to tell them what he saw. When asked if David told him what to say, Gatdet said, "No." On cross-examination, Gatdet acknowledged that the day he spoke to the police is the same day he was told he had to go back to Mary's house. Gatdet also acknowledged he was not happy about having to go back to Mary's house, and that he would rather stay with David.

Several witnesses from the Grand Island Police Department testified. Officer Cliff Hurst testified that on the morning of August 7, 2012, David came to the police station to report that "Deng" threatened him with a gun. David provided a physical description of "Deng," and said Mary would know who "Deng" was. David also provided a license plate number that did not pan out.

Sergeant Kevin Sheeks testified that he stopped Agok's vehicle on August 19, 2012, and arrested him. A black and silver pistol was found in the pocket of a pair of shorts in the trunk of the vehicle.

Officer Chris Anderson testified that prior to August 19, 2012, he had been investigating the August 6 incident, and he had spoken to David, Mary, Gatdet, and Choul. On August 19, Anderson learned Agok had been arrested and he went into work at 10:30 p.m. to interview him. Anderson said, "When I entered the room, I first advised [Agok] of his Miranda rights and made sure he understood his rights and was willing to speak with me about consulting an attorney." When the State asked if Agok verbally told him he was agreeing to speak to him without an attorney, Anderson said, "Yes, he did." When asked if Agok had any questions about his rights, Anderson said, "No, he did not."

Anderson recounted his interview with Agok. Agok told Anderson he and Mary were in her backyard when David showed up and began yelling. An argument took place. Agok stated that David jumped on him and at one point punched him in the chest. Agok went to his car to get a gun to slow things down and keep David away from him. When Agok got the gun out of his trunk, David asked if Agok was going to shoot him. After that, the argument dispersed and they went their own ways. Agok denied making any threatening comments towards David and denied pointing the gun in David's direction. Anderson said he confronted Agok about his statement, told him he had already spoken to David, Mary, and the boys, and said that what Agok was telling him

was not making sense. Agok said he was going to stick with what Mary said. When Anderson asked him why he would stick with what Mary said without knowing what she said, Agok "simply stated he was going to stick to what he had already told me and what Mary had said." After the 15 minute interview, Agok was transported to the jail and Anderson completed his report on the interview. Anderson testified the interview room had the capability to video record, but he forgot to send the notification to the evidence technician to make sure the interview was preserved.

On cross-examination, Anderson acknowledged he read Agok his *Miranda* rights from a *Miranda* waiver form, but said he did not have Agok sign the form "because he was handcuffed." Anderson did not ask Agok to write out a statement after the interview.

Also on cross-examination, Anderson acknowledged he failed to request the preservation of his recorded interviews with David, Gatdet, and Choul. Anderson testified the boys were interviewed together, Gatdet had done most of the talking, and that the boys' comments were contradictory to each other. But on redirect, Anderson said the contradiction was over the size of the firearm Agok used; there was no contradiction that Agok had pointed a gun at David.

Agok, 26 years old at the time of trial, testified in his own behalf. He is from Sudan and came to the United States in 2000. He had been living in Grand Island for almost 2 years. On August 6, 2012, Agok was at Mary's house. He said David came to Mary's house at 4:45 p.m., walked to the back where Agok and Mary were sitting and the children were playing. David looked at Mary and Agok and said, "'[W]hat are you doing here, mother fucker?'" Agok did not say anything. Then David hit Agok in the chest, causing Agok to fall off his chair. David ran towards his car, which was parked behind Agok's car. Agok got up and went to get a pair of shoes from the trunk of his car, because he was barefoot and knew there was going to be a fight. Mary was yelling that she was calling the police and that the police were coming. Agok said he opened his trunk to get his shoes. While he was getting his shoes, David said, "'[W]hat are you looking for, man, what are you looking for, the gun[?]'" Then David grabbed the two boys and put them in the car and took off. Agok said Mary tried to run after them to get the boys out of the car, but David slapped her. Mary ran back saying, "'I am going to call the police to get them back.'" Agok denied ever taking a gun out of his trunk or pointing a gun at David. Agok also denied threatening David in any way.

Agok testified that on August 19, 2012, he was pulled over for running a red light, and was arrested on a warrant not related to the August 6 incident. After his arrest, Agok spoke with Anderson for "a minute to two minutes." Anderson asked Agok if he knew David, and Agok said, "[Y]eah, that's the guy that attacked me at Mary's house." Agok denied telling Anderson that he pulled a gun out of his trunk.

Agok said he was wearing a bandage on August 6, 2012, because he had surgery on a broken pinky finger on his right hand (he said he is right-handed). He claimed his surgery was on August 4, he was supposed to wear a wrap for at least 21 days, but he only wore it for 14 days. On cross-examination, Agok was questioned about the date of his surgery, and was asked if it actually occurred on July 31. Agok responded that the surgery was on August 4, two days before the altercation, and that his medical record was wrong. Agok said he was wearing the wrap on August 6 (the day of the altercation) and on August 19 (the day of his arrest and interview). But during their testimony, David, Sheeks, and Anderson did not recall seeing anything on Agok's hand, e.g.

a bandage, cast, or splint, during their respective interactions with him. (The implication of the bandage was that Agok would not have been able to pick up and use a gun on August 6.)

On cross-examination, Agok said David and Mary did not speak Nuer on August 6, 2012, and that David spoke in English. Agok claimed Anderson did not ask for his side of the story. He denied telling Anderson he would stick with whatever story Mary had told him. Agok also testified he had his gun in the trunk of his car because he moved out of his apartment on July 29, and was staying with a friend.

The jury convicted Agok of both charges. On June 4, 2013, Agok was sentenced to 1 to 2 years' imprisonment for the terroristic threats, with 260 days' credit for time served. He was sentenced to 5 to 8 years' imprisonment for the use of a deadly weapon to commit a felony, with 260 days' credit for time served. The two sentences were to be served concurrently.

### III. PROCEDURAL BACKGROUND

Agok's trial counsel informed Agok she would not be able to represent him on appeal due to his claim that she provided ineffective assistance of counsel. She did, however, assist him in preparing and filing the necessary documents to perfect his appeal. But, she did not file a motion in this court requesting permission to withdraw after Agok's appeal had been perfected.

Agok, appearing pro se, timely filed a notice of appeal, motion to proceed in forma pauperis (IFP), and a poverty affidavit, as well as a document titled "Assignment of Errors," listing ineffective assistance of trial counsel as the sole error assigned. The district court granted Agok's motion to proceed IFP on appeal, and his appeal was docketed in this court as case No. A-13-578.

After his appeal was perfected, Agok filed a pro se motion for the appointment of new counsel in the district court on July 15, 2013. The following day, the district court notified Agok that because of the pending appeal, it did not have jurisdiction to hear his request to appoint new counsel, and therefore, any motions for new counsel must be made to the appellate court. On August 7, Agok filed a subsequent pro se motion for appointment of counsel in this court, which we "[o]verruled without prejudice to filing in the sentencing court." On October 18, in case No. A-13-578, this court dismissed the appeal without opinion, due to Agok's failure to file a brief.

On January 30, 2014, Agok filed a motion for postconviction relief in the district court, alleging his trial counsel was ineffective for failing to file an appeal. Agok also filed an application and affidavit to proceed IFP, and a motion for appointment of counsel. On February 3, the district court denied Agok's requests to proceed IFP and for appointment of counsel. The court also denied Agok's motion for postconviction relief without an evidentiary hearing. On February 12, Agok filed an appeal of the district court's denials, and his appeal was docketed in this court as case No. A-14-141. On November 10, after finding Agok had been deprived of his right to be represented by counsel on appeal, this court reinstated Agok's right to file a direct appeal and ordered the district court to appoint an attorney to represent Agok in his appeal. See *State v. Agok*, 22 Neb. App. 536, 857 N.W.2d 72 (2014). On December 4, the district court appointed new counsel to represent Agok on his appeal (his second attorney), but counsel filed an appeal out of time (one day late). On February 3, 2015, in case No. A-14-1143, this court dismissed the appeal without opinion. Agok's motion for rehearing was denied on March 9, and his petition for further review was denied on June 17. This court's mandate dismissing the appeal was issued on July 6.

In an order filed on July 6, 2015, the district court once again appointed new counsel to represent Agok (his third attorney). But this new attorney filed no pleadings.

On September 23, 2016, the district court yet again appointed new counsel to represent Agok (his fourth attorney), after several written requests for new counsel were filed by Agok. Agok's counsel filed a motion for postconviction relief on October 28, claiming ineffective assistance of his second and third counsel. On January 31, 2017, the district court granted Agok's motion and reinstated his right to a direct appeal from his original conviction. Agok timely filed a notice of appeal, and the present appeal is a direct appeal from his original conviction.

## IV. ASSIGNMENT OF ERROR

Agok assigns as error that his conviction should not have been entered because his trial counsel was ineffective.

## V. STANDARD OF REVIEW

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## VI. ANALYSIS

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Agok is represented on direct appeal by different counsel than the counsel who represented him at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Mendez-Osorio, supra*. Otherwise, the issue will be procedurally barred. *Id.* The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

To prevail on a claim based on counsel's ineffective assistance, the defendant must show, in accordance with *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), that counsel's performance was deficient. In other words, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. See *State v. Mendez-Osorio, supra*. Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A court may address deficient performance and prejudice in either order. *Id.*

On direct appeal, an appellate court can determine whether the record proves or rebuts the merits of a claim of ineffective assistance of trial counsel only if it has knowledge of the specific conduct alleged to constitute deficient performance. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). Therefore, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance

claim on direct appeal. *Id*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id*.

Agok claims his trial counsel was ineffective for (1) failing to present evidence requested by him, (2) failing to file a motion to suppress, (3) failing to file a motion in limine, and (4) failing to request a subpoena for a witness. We will address each claim in turn.

(a) Failure to Present Evidence

*(i) Differences in Testimony*

Agok contends his trial counsel "did not fully cross-examine several of the witnesses in such a way that drew sufficient attention to the differences between their testimony and their prior statements." Brief for appellant at 12-13. He acknowledges counsel raised some contrasts, but said "greater emphasis should have been placed on the differences" to further demonstrate the unreliability of those witnesses. *Id*. at 13. With the exception of his allegations regarding Gatdet and David discussed below, we find Agok's allegations related to the cross-examination of "several witnesses" to be general, rather than specific allegations of deficient conduct. General allegations of deficient conduct are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *State v. Filholm, supra*.

As an "example" of his general claim, Agok did give page numbers from the bill of exceptions where we could find some inconsistencies in the testimonies of Gatdet and David. In the pages cited by Agok, his counsel questioned Gatdet regarding his inconsistent statements about whether Agok had ever spent the night at their house, and the size and color of Agok's gun. Counsel questioned David regarding his inconsistent statements about where his car was parked that night (i.e. in the street or in the driveway), his work schedule and the time of his break on the night of the incident, and the timing of the children's doctor appointment that day. Our review of the record shows that trial counsel's questioning of Gatdet and David was appropriate and adequate. Agok has not shown that his counsel's performance was deficient regarding the examination of these two witnesses and therefore this claim for ineffective assistance of counsel fails.

*(ii) Officer Anderson*

Agok contends his trial counsel failed to properly cross-examine Anderson by not bringing "more attention" to the amount of time between when the police report was made and when witnesses were interviewed. There was limited examination on the timing of the interviews, and because this claim implicates matters of trial strategy, it cannot be determined on the record before us.

Agok also contends his trial counsel failed to properly cross-examine Anderson by not bringing "more attention" to the fact that the videos of the interviews with a number of the witnesses were not preserved. Our review of the record shows that trial counsel repeatedly questioned Anderson about his failure to preserve the interview videos of Gatdet, Choul, David, and Agok. And during closing argument, trial counsel said Anderson "did a sloppy job." Counsel argued that Anderson "interviews my client" but "[h]e doesn't bother to preserve the evidence." Anderson "interviews the children" but "[h]e doesn't bother to preserve the evidence." Anderson

"interviews David" but "[h]e doesn't bother to preserve the video." Agok has not shown that his counsel's performance was deficient regarding questioning the preservation of video evidence and therefore this claim for ineffective assistance of counsel fails.

### *(iii) Timecard*

Agok also contends his trial counsel failed to introduce David's timecard from his employment which would have demonstrated there would not have been sufficient time for the alleged events to have occurred during his break. Because this claim regarding the timecard implicates matters of trial strategy, it cannot be determined on the record before us.

### (b) Motion to Suppress

Agok contends his "trial counsel failed to raise a defense that he was not advised of his *Miranda* rights at the time that he was arrested" and that "[s]uch a defense would have been raised in the form of a Motion to Suppress any statements made by [Agok] after the time that he was arrested." Brief for appellant at 13-14. He claims that if the motion to suppress would have been filed and granted, then Anderson would have been prevented from testifying as to what Agok told him, namely, that he and David argued and that Agok "went to his car to get his gun, but that he never pointed the gun at [David] or [made] threatening statements to him." *Id*. at 14.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court sought to protect the Fifth Amendment privilege against compelled self-incrimination from the inherently compelling pressures of custodial interrogation. *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012). To do so, the Court required law enforcement to give a particular set of warnings to a person in custody before interrogation: that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to an attorney, either retained or appointed. *Id*. While the particular rights delineated under *Miranda* are absolute, the language used to apprise suspects of those rights is not. *State v. Nave*, *supra*. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required. *Id*. And pursuant to Neb. Rev. Stat. § 29-115 (Reissue 2016),

> Any person aggrieved by a statement taken from him or her which is not a voluntary statement, or any statement which he or she believes was taken from him or her in violation of the fifth or sixth amendments of the Constitution of the United States, may move for suppression of such statement for use as evidence against him or her.

Anderson testified that he read Agok his *Miranda* rights from a *Miranda* waiver form, but he did not have Agok sign the form "because he was handcuffed." Agok did not testify about whether or not he was given his *Miranda* rights. Because an evidentiary hearing will be necessary, the record before us is insufficient to review Agok's ineffectiveness claim on the motion to suppress issue.

### (c) Motion in Limine

Agok contends his trial counsel was deficient in failing to file a motion in limine preventing testimony regarding the interviews conducted by law enforcement. Agok argues the failure of law enforcement to preserve interview videos prevented him from impeaching Anderson "about any potential misstatements or mistaken observations by him of the interview." Brief for appellant at

15. "Furthermore, [Agok] and his trial counsel were prevented the opportunity to impeach Gatdet . . . and [David] as to any misstatements made when speaking to Officer Anderson during the interviews other than those observed by Officer Anderson." *Id*. Agok claims that had his trial counsel filed a motion in limine "to address the information gained from the interviews, the potential prejudice faced by [him] could have been avoided." *Id*.

Agok appears to be claiming the failure to preserve the recordings of interviews affected his ability to impeach, or otherwise challenge the credibility of, the testimony of Anderson, Gatdet and David. However, impeachment or credibility issues are not raised through a motion in limine. A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. See *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013). A request for an evidentiary ruling made in advance of trial which seeks to exclude the production of potentially inflammatory evidence before the jury, and which seeks relief on the ground the suggestive or uncontrolled revelation of that evidence to the jury may unfairly prejudice the determination of the case may be regarded as a motion in limine. See *id*. It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence. *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

Additionally, the State correctly points out that terroristic threats and use of a deadly weapon are not among the offenses listed in Neb. Rev. Stat. § 29-4503 (Reissue 2016) that require electronic recordation of statements made in connection with the listed offenses. Accordingly, there was no violation of § 29-4503 which would prevent officers from testifying about the statements made by Agok. As to the potential impeachment of witness testimony, Agok merely speculates there might have been something on the videotapes he could have used to impeach or otherwise challenge the credibility of Anderson, Gatdet, and David. Because there was not a legitimate basis for the motion in limine, Agok did not receive ineffective assistance of counsel on this claim.

(d) Failure to Subpoena Witnesses

Agok contends his trial counsel was deficient in failing to subpoena certain witnesses to testify at trial, specifically Mary and her children. Agok does not set forth specific factual allegations as to what those witnesses would have said.

The State argues Agok's claim is insufficient to adequately present or preserve the issue for postconviction. Brief for appellee at 12. It then quotes the following excerpt from *State v. Abdullah*, 289 Neb. 123, 133, 853 N.W.2d 858, 867 (2014):

> Our case law is clear that were this a motion for postconviction relief, Abdullah would be required to specifically allege what the testimony of these witnesses would have been if they had been called in order to avoid dismissal without an evidentiary hearing. Without such specific allegations, the postconviction court would effectively be asked to "'conduct a discovery hearing to determine if anywhere in this wide world there is some evidence favorable to defendant's position.'"

Brief for appellee at 12. However, *Abdullah* goes on to state:

> In a direct appeal, we do not need specific factual allegations as to who should have been called or what that person or persons would have said to be able to conclude that any

evidence of such alleged ineffective assistance will not be found in the trial record. Nevertheless, we are concerned with the lack of any specificity as to who those uncalled witnesses were from the standpoint of a potential postconviction court's ability to identify if a particular failure to call a witness claim is the same one that was raised on direct appeal.

*State v. Abdullah*, 289 Neb. at 133-34, 853 N.W.2d at 867. Here, Agok has sufficiently identified the uncalled witnesses, Mary and her children. He does not need to specifically allege what they would have testified to. Accordingly, Agok's ineffective assistance of counsel claim regarding the failure to subpoena witnesses was sufficiently raised. However, because this claim implicates matters of trial strategy, it cannot be determined on the record before us.

## 2. SENTENCES

While Agok does not assign error to or argue the sentences imposed, the State raises issues of plain error in the sentencing. An appellate court always reserves the right to note plain error that was not complained of at trial or on appeal. Plain error may be found on appeal when an error, plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Kantaras*, 294 Neb. 960, 885 N.W.2d 558 (2016). A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review. *Id*.

### (a) Concurrent Sentences

Although Agok was convicted of use of a deadly weapon to commit a felony in violation of § 28-1205(1), the district court ordered the sentence to be served concurrently with the sentence for terroristic threats. The concurrent feature of the sentence for use of a deadly weapon contravenes § 28-1205(3).

Section 28-1205(3) provides that "sentences imposed under this section shall be consecutive to any other sentence imposed." The Nebraska Supreme Court has found plain error where a court ordered a sentence for use of a deadly weapon to run concurrently to other felony sentences imposed. See *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). See, also, *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017); *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014). Although it is generally within the trial court's discretion to direct that sentences imposed for separate crimes be served concurrently or consecutively, § 28-1205(3) does not permit such discretion in sentencing. Instead, § 28-1205(3) mandates that a sentence for the use of a deadly weapon in the commission of a felony be served consecutively to any other sentence imposed and concurrent with no other sentence. *State v. Mendez-Osorio, supra*.

Because § 28-1205(3) mandates the sentence imposed for a conviction of use of a deadly weapon be consecutive to any other sentence and concurrent with no other sentence, the district court did not have the authority to order the sentence for the conviction of use of a deadly weapon to commit a felony to run concurrently with the other sentence. *State v. Ramirez, supra*. Thus, the imposition of the sentence wherein the sentences were to be served concurrently was plain error. On this basis, the sentences for all convictions must be vacated and the cause remanded for resentencing. An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *State v.*

*Mendez-Osorio, supra*. Accordingly, we vacate all sentences and remand the cause for resentencing.

### (b) Good Time Credit

The State also notes that the district court gave Agok 260 days' credit for time served on each offense, which cannot be done even when the sentences are to run concurrently (as the district court originally ordered). See *State v. Banes*, 268 Neb. 805, 813, 688 N.W.2d 594, 599-600 (2004) (Presentence credit is applied only once; "although we recognize that when an offender has received concurrent sentences, the 'effect' is that credit is applied against each sentence.") We have already found the imposition of the sentence wherein the sentences were to be served concurrently was plain error and must be vacated and the cause remanded for resentencing. On remand, the court shall apply any good time credit only once. See, Neb. Rev. Stat. § 83-1,106 (Reissue 2014); *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011) (under § 83-1,106, an offender who receives consecutive sentences is entitled to credit against only the first sentence imposed, thereby crediting the days against the aggregate of the minimum and the aggregate of the maximum sentences imposed).

### (c) Mandatory Minimum Sentence

Although not raised by the State, we note one additional issue of plain error in the sentencing. Agok's conviction for use of a deadly weapon (firearm) to commit a felony (Count II) was a Class IC felony, and was punishable by a *mandatory minimum* of 5 years' imprisonment and a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Although the district court sentenced Agok to 5 to 8 years' imprisonment for his conviction on Count II, it did not include the requisite *mandatory minimum* language in its sentence, which would affect Agok's release date. See *Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017) (offender cannot become eligible for parole until the mandatory minimum is served in full; good time credits can be applied to the maximum term of an indeterminate sentence only after the offender serves the mandatory minimum). See, also, Neb. Rev. Stat. § 83-1,110 (Reissue 2014). Again, we have already found the imposition of the sentence wherein the sentences were to be served concurrently was plain error and must be vacated and the cause remanded for resentencing. On remand, the court shall address the mandatory minimum sentencing requirement for Count II.

## VII. CONCLUSION

For the reasons stated above, we find several of Agok's claims for ineffective assistance of counsel fail, while other claims implicate matters of trial strategy and cannot be determined on the record before us. Accordingly, we affirm his convictions. However, because the district court imposed unauthorized sentences, we vacate all sentences and remand the cause for resentencing.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.