IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BOSSE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTEN C. BOSSE, APPELLANT.

Filed April 10, 2018.    No. A-17-084.

Appeal from the District Court for Adams County: TERRI S. HARDER, Judge. Affirmed.

Shon T. Lieske, Adams County Public Defender, Jay Michelsen, and Brian Israel for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Christen C. Bosse (Bosse) appeals his multiple convictions following a jury trial in the district court for Adams County. Bosse assigns error to the district court's rulings regarding his challenges to certain jurors, evidentiary issues, and his requested jury instructions. Bosse also claims the district court imposed excessive sentences. We affirm.

BACKGROUND

Bosse was involved in an altercation at a bar in Hastings, Nebraska, on March 15, 2016. He and his father, Kim Bosse (Kim), went to the bar that evening, and Bosse was involved in an argument that led to a fight. Ultimately two other patrons were stabbed, and Bosse was arrested and taken into custody. Bosse was charged with two counts of assault in the second degree, two

- 1 -

counts of use of a deadly weapon (other than a firearm) to commit a felony, and one count of possession of a deadly weapon (other than a firearm) by a prohibited person.

A jury trial was held in November 2016. Many of the witnesses and participants in the altercation were bar patrons who were socializing at the bar on the night of March 15. Several testified they were either intoxicated or had been drinking that night. Some were also unable to see or hear specific parts of the entire sequence of events based on their location in the bar or at what point the altercation came to their attention. Testimony about the specific details of the altercation varied accordingly, but the facts pertinent to this appeal are set forth below.

ALTERCATION INSIDE BAR

Bradley Gregory testified he and two of his teammates, Andre Reiners and Aaron VanSteenberg, were playing pool as part of a league along with several other patrons, and a number of patrons were also engaged in a poker game at various times throughout the night. Reiners testified that when he walked into the bathroom, Kim used "a racial slur." Reiners asked Kim "if we had a problem," to which Kim did not respond. Kim testified, "I don't use racial slurs. And I have black friends." Reiners left the bathroom, and claimed Kim then kicked out one of the door panels on his way out of the bathroom. Kim testified that was not true; rather, he claimed the panel had been out for years. According to Reiners, Kim pointed at Bosse, and Reiners approached Bosse and asked him why his father was acting that way. Bosse told Reiners he "didn't have a problem" with Reiners. Reiners responded he had heard Bosse was in prison for 13 years. Bosse told him "you know who don't [sic] go to prison is bitches and snitches," and then Bosse also used a racial slur and started to swing a punch at Reiners. Reiners then pulled Bosse to the ground and the two wrestled. The interaction between Reiners and Bosse was observed by Mallory Guinan, the only employee working at the bar that evening. Guinan said she saw Bosse fighting with "a bigger black guy" (she did not know his name) next to a pool table. She asked Gregory and another bar patron, Anthony Wilson, to step in and break up the fight.

Gregory testified that he could see Reiners and Bosse having a conversation, and he could tell from their postures something was wrong. Gregory got up to go make sure Reiners (his teammate) did not get into a fight. Bosse tried to punch Reiners before Gregory could get there, and after Reiners and Bosse began to wrestle, Gregory saw Kim grab a pool cue and raise it to hit Reiners from behind. Gregory grabbed the pool cue and wrestled it out of Kim's hands, and then proceeded to where Wilson, and another man Gregory identified as "Eugene," were breaking apart Reiners and Bosse. Eugene took Reiners outside through one door, and Wilson and Gregory took Bosse outside through a separate door.

VanSteenberg testified he saw Gregory take the pool cue away from Kim and push him to the ground. He saw Kim grab another pool cue, so VanSteenberg punched him in the face to stop him from using the second cue to hit Reiners. VanSteenberg continued to punch Kim, and Kim then hit VanSteenberg on the side of the head with the pool cue. VanSteenberg punched Kim two more times after being hit on the head. VanSteenberg then saw Gregory take Bosse outside with Wilson, so he went outside to help Gregory.

Anthony Purvis testified he was standing by the jukebox in the bar when he heard a commotion and loud voices behind him. He turned and saw a scuffle involving Bosse, and watched

others in the bar join in. He heard a sound similar to a pool cue snapping and looked over and saw Kim fall backwards onto his back with a pool cue in his hand, but he did not see what caused Kim to fall. Kim's head appeared to be injured and it was bleeding. Kim got up and began to swing the pool cue, and Purvis grabbed him and "bear hugged" him from behind to keep people from getting injured. At that point, he saw Bosse getting escorted out of the bar by Wilson and a few other individuals. An unidentified individual attempted to punch Kim while Purvis was holding him, but Purvis would not let him, and eventually that other person went outside. Guinan then motioned to Purvis to take Kim out of the bar, which Purvis did.

## EVENTS UPON EXITING BAR

Gregory testified Bosse struggled to get past Wilson to go back into the bar as they were escorting him out. Wilson recalled that Bosse was yelling racial slurs as he was being taken out of the bar. According to Gregory, Bosse continued to try to push Wilson to get past him, and Wilson eventually pushed him to the ground. Unable to overcome Wilson, Bosse pulled out a knife and stabbed Wilson in the back after Wilson had turned around to walk back into the bar. Wilson wheeled around to face Bosse, and Bosse tried to stab him again. Guinan, who was following the people she told to go outside, saw Bosse "pull a knife out of his pocket, and he just started swinging." Gregory testified that he jumped on Bosse and took him to the ground, and Bosse stabbed Gregory in the hand. Gregory struggled with Bosse on the ground for a few minutes while trying to take away the knife. Gregory was on top of Bosse when a patron he identified as "Rachel," who worked at the bar occasionally, came out and grabbed Gregory's shoulder. This loosened Gregory's grip on Bosse, who then stabbed him in the hand a second time. At that point, other patrons, including VanSteenberg and Reiners, came and assisted Gregory.

Reiners testified that he stepped on Bosse's hand to get him to drop the knife, and then kicked the knife away from the struggling group. He did not see where the knife went and did not see it again after that. Eventually Gregory let Bosse get up, and Bosse tried to leave, but he was stopped by Leon Lindstrom. Lindstrom testified he wrestled with Bosse to prevent him from leaving before he could be detained by the police.

As for Bosse's father, Purvis testified that he let go of Kim as they were getting outside, and Kim then pulled a knife out and began to charge at the patrons who were holding Bosse down outside. Purvis grabbed Kim again, and pulled him to the ground. Purvis kept Kim on the ground until law enforcement arrived and handcuffed him. Kim testified that "that's a lie," and that he "didn't have no knife out." Kim did acknowledge at trial that he had a knife on him that night, and when exhibit 47 was shown to him, he acknowledged that it was his knife. He did not recognize the knife marked as exhibit 48.

## TESTIMONY FROM BOSSE

Bosse, age 37 at the time of this incident, testified he had gone to the bar with his father. Bosse played a couple games of pool with Wilson. He testified the initial altercation inside the bar was the result of Reiners and VanSteenberg approaching him unprovoked, and confronting him while he was at a table. He denied using any racial slurs, asserted that his father would not have

either, and stated he did not have anything against African-American men. He claimed that Reiners said "I heard you just got out of prison, you think you're tough." Bosse testified,

> I thought these two guy[s] are idiots and they - and I guess something is going to happen. I mean, I got my back to a wall, I got two six-foot guys standing in front of me that I've never met before. And . . . I don't know where they came out of this stuff with.

At the time, Bosse was unable to see his father over Reiners and VanSteenberg because they were standing shoulder-to-shoulder. When they finally parted, Bosse could see his father on the ground and he appeared to have an injury to his head, and blood running down his face. Bosse did not see what injured his father because Reiners and VanSteenberg were in front of him, and he did not see anyone strike his father after he saw his father was bleeding. Bosse attempted to rush to his father's aid, but was restrained by Reiners. Bosse recalled he and Reiners struggled with each other and VanSteenberg punched him a few times until Wilson and a few other patrons broke them up. Bosse again struggled to get to his father, but Wilson pushed him towards the door. Bosse was asked if he could see anyone else by his father at this point, and he responded:

> I really didn't have a chance to see people around. It was just everybody was there . . . . And everybody as you seen [sic] was over 6-foot. So it was hard to see anything other than my father on the ground because that's what I was pinned in on.

Bosse said Wilson, Gregory, VanSteenberg, and other unidentified patrons continued to push him towards the exit. They moved into a short, narrow hallway (the hallway led out to a door to exit the building to a small patio for smoking and then to the street). Bosse continued to struggle to get past Wilson, but could not get around him. Bosse claimed he was stabbed twice in the hand by an unidentified object carried by patrons who were behind Wilson and helping to push him outside.

Bosse testified about his mindset at this point in the struggle: "I thought, shit, my dad's stuck in there, I've just been stabbed twice and they're not letting me get to my father. You know, what are they doing to my dad. That's what I thought. If they're doing this to me, what are they doing to my father." He also believed Wilson was "shielding the people who were stabbing [him]." Bosse was asked on redirect if he felt his father was in "grave danger" when he was in the bar, and he responded, "[A]bsolutely I felt that way." He was then asked why he felt that way, to which he responded,

> Because [Kim] was bleeding all over the place. And when he looked at me it was like his face was blank. He just survived a horrible accident. I mean, he's 62 years old. . . . You can't be kicking [and] hitting people 62 years old in the head.

While still face-to-face with Wilson in the hallway, he then took out his knife, pulled Wilson close to him, and reached around him to stab him in the back. Bosse stated he was just "trying to get [Wilson] out of [his] way."

Bosse testified that, after he stabbed Wilson, Wilson then "pretty much picked me up," and they went through the door, through the railing around the patio, and out into the street. Once they landed, several patrons joined Wilson in holding Bosse down. Gregory jumped on his neck while Wilson was holding his legs. According to Bosse, Gregory cut himself several times trying to grab

the blade of Bosse's knife. Bosse stated, "I never swing [sic] a knife at [Gregory]. The only one I poked was [Wilson]. I never swung a knife at [Gregory]. . . . [Gregory] cut himself up. Kid kept grabbing the blade." Bosse claimed he was trying to fight back while this was happening because he was being kicked and punched. He stated that he was not going to let go of the knife because he had already been stabbed twice and did not want to get stabbed by his own knife. Someone stomped on his arm to get him to release the knife, which he eventually did release. Bosse claimed the other patrons only released him when someone yelled out that the police were arriving. Bosse then began walking away towards his father's truck to see if he had made it out of the bar. Bosse testified that Lindstrom, who Bosse said was highly intoxicated based on their interaction earlier in the night at the bar, tackled him against the wall as he was walking away. They wrestled until the police arrived.

Bosse testified he was trying to protect himself and his father that night.

EVIDENCE POST-ALTERCATION

Police arrived on the scene and detained and handcuffed Bosse, Lindstrom, and Kim. One of the responding officers, Officer Kelly Scarlett, testified he arrived at the scene about a minute after receiving the dispatch that there had been a stabbing at this location. Scarlett stated that as he was pulling up to the bar, he observed "a large crowd standing on the northwest corner of that area," and there "was a black male that started approaching [Scarlett's] vehicle that had his hands in the air and appeared to be holding a knife," "between his thumb and forefinger . . . with the blade pointed down." The male holding the knife was later identified as Eugene Cosey, Jr. Scarlett testified that when Cosey handed him the knife, Cosey told him "this is the knife that the guy used to stab the two people or the people." Scarlett stated that Cosey "was pointing towards the people that were standing by the building and more towards the subject that was wearing a black hoodie." Bosse was wearing a black hoodie and pair of blue jeans that night. Scarlett described Cosey's demeanor as "calm, maybe a little anxious as he was handing me the knife[,]" and "[i]t appeared that he just wanted to get rid of it so he didn't have to deal with it anymore." Scarlett testified "there was a lot of blood on the knife," and he described the knife as being a "buck style knife, folding, brownish colored handle with I believe brass color ends on it." Scarlett took the knife from Cosey and locked it in Officer Joshua Fink's car. He then assisted the other officers at the scene. Fink returned the knife to Scarlett after they returned to the station, and Scarlett then placed it in a box and submitted it to a temporary evidence locker.

After the police interviewed several of the bar patrons, Lindstrom was released, and Bosse and his father were taken to the hospital, and then to the police station. Gregory and Wilson also went to the hospital for treatment of their stab wounds. Bosse was subsequently charged as previously noted.

CONVICTIONS AND SENTENCES

After the close of the evidence, Bosse was convicted by the jury of all five charges. He was sentenced to 10 to 12 years' imprisonment for each count of assault in the second degree (Counts I and II), 3 to 5 years' imprisonment for each count of the use of a deadly weapon (other than a firearm) to commit a felony (Counts III and IV), and 2 to 4 years' imprisonment for the possession

of a deadly weapon by a prohibited person conviction (Count V). The sentences for Counts I, II, and V are to run concurrently to each other. The sentences for Counts III and IV are to run consecutively to each other and consecutively to all other counts. He received a credit of 308 days for time already served. Bosse timely appealed.

## ASSIGNMENTS OF ERROR

Bosse assigns, reordered and restated, that the district court erred by (1) failing to exclude Cosey's hearsay statements; (2) allowing a knife into evidence over his chain of custody objection, (3) overruling his motion to strike, for cause, A.B. and C.L. from the jury, (4) not giving his requested jury instructions regarding self-defense and defense of others, and (5) imposing an excessive sentence.

## STANDARD OF REVIEW

The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

The decision to retain or reject a venireperson as a juror rests in the trial court's discretion, and we will reverse only when it is clearly wrong. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

Whether jury instructions given by a trial court are correct is a question of law. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

## ANALYSIS

### HEARSAY OBJECTION TO COSEY'S STATEMENTS

Bosse asserts the district court erred by allowing Scarlett to testify as to statements Cosey made to him when he arrived at the scene. Scarlett testified that a man, subsequently identified as Cosey, approached his vehicle with his hands in the air and was holding a knife between his thumb and forefinger with the blade pointed down. When Cosey handed Scarlett the knife, Cosey told him "this is the knife that the guy used to stab the two people or the people." Scarlett stated that Cosey "was pointing towards the people that were standing by the building and more towards the subject that was wearing a black hoodie." Bosse was wearing a black hoodie and pair of blue jeans that night. Scarlett described Cosey's demeanor as "calm, maybe a little anxious as he was handing me the knife[,]" and "[i]t appeared that he just wanted to get rid of it so he didn't have to deal with it anymore."

The district court overruled Bosse's hearsay objection to this testimony, finding the statements fell under the excited utterance exception to the rule against hearsay. The court also concluded the statements were not testimonial because Scarlett did not ask Cosey any questions to elicit his statements; rather, Cosey approached Scarlett and offered them freely.

Bosse argues on appeal that Cosey's statements to Scarlett failed to meet all of the elements of the excited utterance exception because Cosey did not witness the startling event (stabbings) personally, and therefore his statements were inadmissible hearsay. He further argues that their erroneous admission violated his right to confront and cross-examine witnesses under the Nebraska and federal Constitutions. Bosse does not explain, however, how the admission of Cosey's statements could possibly prejudice him, particularly since Bosse himself admitted to possessing the knife and stabbing Wilson. Additionally, other witnesses testified about the events that unfolded that evening, and the statements made by Cosey to Scarlett were simply cumulative of other evidence properly received into evidence.

In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was harmless beyond a reasonable doubt. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). Harmless error review looks to the basis on which the jury actually rested its verdict. *Id.* The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error. *Id.* The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *Id.*

Accordingly, even if we assume without deciding that the district court erred in admitting Cosey's hearsay statements, any such error would not require reversal since there is other cumulative and relevant evidence to support the jury's verdicts. Both Gregory and Wilson testified Bosse stabbed Wilson in the back, and VanSteenberg and Gregory both testified Bosse stabbed Gregory in the hand. Guinan saw Bosse pull a knife out of his pocket and start swinging. Significantly, Bosse himself testified as follows:

> [Defense counsel]: What happened after that?
> Bosse: Well, then I pulled a knife out of my pocket.
> [Defense counsel]: So you had a knife in your pocket?
> Bosse: Yes, I did.
> [Defense counsel]: And can you describe what that knife was?
> Bosse: It's a buck anniversary edition.
> [Defense counsel]: Okay. Is it a folding knife?
> Bosse: Yes, it is.
> [Defense counsel]: And you've seen the exhibits that have been offered, is that the same knife?
> Bosse: Yes, sir.

Bosse then admitted he used the knife to "poke [Wilson] in the bottom of his back." He also stated it was the same knife that injured Gregory, though he claimed Gregory was injured attempting to grab the knife. We fail to see how Cosey's hearsay statements could possibly prejudice Bosse in light of this other admitted evidence. Thus, we need not decide whether it was error to admit Cosey's hearsay statements, because even if it was, any such error was harmless.

- 7 -

Bosse asserts the district court erred by allowing exhibit 48, a knife, into evidence. As noted previously, Scarlett testified the knife in question was handed to him by Cosey, who told him the knife was the one that had been used to stab people. Scarlett also testified the knife handed to him by Cosey was the one admitted as exhibit 48.

Bosse argues that without the hearsay of Cosey, the State cannot establish that the knife recovered by Scarlett was the same one he used, and that it is not clear from the record how exhibit 48 came into Cosey's possession. He also claims that even with the hearsay statements, there was still a break in custody from the time Bosse let go of a knife to the time when Cosey picked up the one he handed to Scarlett. Finally, Bosse points out that the State had other avenues to identify the knife in question (fingerprints and DNA testing), but did not pursue them. Without such testing, Bosse suggests "there exists a break in the chain of evidence" and the "admission of the knife was in error." Brief for appellant at 34.

In determining whether the State has established a sufficient chain of custody, a court decides the issue on a case-by-case basis, considering the following factors: the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012). This same standard applies when the issue is whether gaps in the chain of custody or alterations in the evidence compromise the integrity of the State's evidence as a whole. *Id*.

Once again, Bosse's own testimony eliminates the need for a detailed analysis on this issue. There is no concern with regard to whether exhibit 48 was the knife in Bosse's possession on March 15, 2016. As the State points out, Bosse testified that exhibit 48 was the knife he used during the altercation. He testified:

> [Prosecuting attorney]: [Bosse], this is your knife? Can you see it?
> Bosse: That's my knife right there.
> [Prosecuting attorney]: That's the one you used to poke [Wilson]?
> Bosse: Yes. (Inaudible.)
> . . . .
> Bosse: I said it's a 50th anniversary buck.
> [Prosecuting attorney]: The state showed the witness Exhibit No. 48.

And as established by Scarlett, exhibit 48 is the knife that was given to him by Cosey upon Scarlett's arrival. Scarlett took the knife and locked it in Fink's car. He then assisted the other officers at the scene. Fink returned the knife to Scarlett after they returned to the station, and Scarlett then placed it in a box and submitted it to a temporary evidence locker. The evidence officer for the Hastings Police Department testified as to how the knife was stored, and the steps taken when it was removed from the evidence locker to be photographed and measured, as well as to be brought to trial. Any concerns related to whether exhibit 48 was actually Bosse's knife, and specifically, that it was the knife he used to stab Wilson and injure Gregory, were overcome by Bosse's own testimony acknowledging the same. We find no error in the admission of exhibit 48,

but even if it was admitted in error, Bosse cannot establish prejudice, and thus, any error would be harmless.

MOTION TO STRIKE JURORS FOR CAUSE

Bosse assigns that the district court erred by overruling his motion to strike A.B. from the jury for cause. We note Bosse's assignment of error included prospective jurors A.B. and C.L., but Bosse puts forth no argument in his brief regarding the denial of his request to strike C.L. for cause. Accordingly, we consider only the denial of Bosse's motion to strike A.B. for cause. See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

The decision to retain or reject a venireperson as a juror rests in the trial court's discretion, and we will reverse only when it is clearly wrong. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011). And even if a trial court erroneously overrules a challenge for cause, we will not reverse the court's decision unless the defendant can show that an objectionable juror sat on the jury after the defendant exhausted his or her peremptory challenges. *Id*. Under Neb. Rev. Stat. § 29-2006 (Reissue 2016), jurors in a criminal trial may be challenged for cause. But the law does not require that a juror be totally ignorant of the facts and issues involved in the case. *State v. Dixon, supra*. A dismissal of the juror is not required if a prospective juror formed an opinion about the defendant's guilt or innocence based on newspaper statements, communications, comments or reports, or upon rumor or hearsay if the prospective juror states under oath that he or she can render an impartial verdict and the court is satisfied of such. See *id*. We give deference to a trial court's determination of whether a prospective juror can apply the laws impartially. *Id*.

The inquiry in ruling on a motion to strike a prospective juror for cause is whether the conditions behind a juror's familiarity with a party, victim, attorney, or witness are such that those connections would probably subconsciously affect his or her decision of the case adversely to the defendants; however, this does not encompass a mere social acquaintanceship in the absence of other indicia of a relationship so close as to indicate the probability of partiality. *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). The law does not require that a juror be totally ignorant of the facts and issues involved in the case; it is sufficient if the juror can lay aside his or her impression or opinions and render a verdict based upon the evidence. *Id*. We defer to the trial court's judgment on a motion to strike for cause because the trial court is in the best position to assess the demeanor of the venire and of the individuals who compose it. *Id*.

Bosse moved the court to strike A.B. for cause twice during voir dire in the following exchange:

> [Defense counsel]: Your Honor, I am going to make a motion to strike for cause. I think there's a lot of conflicts with this witness, and I'm not sure that she's going to be able to be impartial here. And I think [A.B.] is a very nice person, she's been very candor [sic], but I'm not sure she [sic] the best juror for this type of case.
>
> THE COURT: Okay. Well, I mean, I think she's answered all the questions still leaving her in the pool. And I'm just going to follow up with the important one which is given the fact that you're married to a police officer, you've been a victim of violent crime, can you sit in that courtroom over the next three to four days and fairly and impartially

- 9 -

consider the evidence and then deliberate on it with an open mind giving each side a fair shake?

[A.B.]: I would hope so. I mean --

THE COURT: And I guess at this point I need a yes, I can, or no, I don't think I can.

[A.B.]: Yes.

THE COURT: Okay. All right. I'm going to overrule the motion then to remove the juror for cause. You will remain on the panel.

Anything else, Counsel?

[Defense counsel]: May I ask one more question?

THE COURT: Sure.

[Defense counsel]: [A.B.], do you think you're the best juror to hear a case like this just given the nature of the crime that we've discussed and the issues that you've raised in voir dire thus far, or do you think it would be better for you to be a juror on another case?

[A.B.]: Honestly probably not. I, you know, I don't -- I don't know. That's hard for me to say. Just I don't know.

[Defense counsel]: Your Honor, I would renew my motion to strike.

THE COURT: I think your question doesn't state the standard at all. It may well be that she would have fewer conflicts in a car crash case or fewer, you know, you wouldn't be concerned about the fact that her husband is in law enforcement in a civil case. But the standard is not whether she believes she'd be a better juror, not -- the standard is can she fairly and impartially hear the evidence, and she's indicated that she can. So I'm going leave her on.

Bosse argues on appeal that the denial of his motion to strike A.B. for cause resulted in the loss of a peremptory strike, which was necessary to protect his right to an impartial jury. He argues A.B. was biased because:

[S]he was the victim of sexual assaults which left her uncertain as to whether she would be able to remain impartial; additionally, [A.B.]'s prior statements during voir dire that she had been a bouncer previously and that her husband is a police officer, which causes her to frequently communicate with law enforcement officials, creates scrutiny as to whether she could remain impartial.

Brief for appellant at 21. Bosse also argues "it stands to reason" A.B. felt compelled to respond she could remain impartial, and "it is possible" she felt a duty to do so because the court had previously commented on the number of jurors who had already been dismissed by stating, "'I don't think I've ever lost this many members of a panel.'" *Id*. at 23.

We conclude the district court did not clearly err by overruling Bosse's motion to strike A.B. for cause. A.B. was asked explicitly if she could be fair and impartial in considering the evidence, and she answered in the affirmative when the court pushed her for a clear yes or no answer. The district court found this exchange sufficient to allow A.B. to sit on the jury, and we find nothing in the record to indicate the court's finding was clearly erroneous. It is of no moment

that A.B. responded she would not be the best juror for Bosse's case because, as the district court properly pointed out during voir dire, that is not the correct standard. Bosse's speculation as to any pressure A.B. may have felt to answer in the affirmative is unpersuasive.

Bosse claims that by having to use his six peremptory strikes on jurors, including A.B. and C.L., he was unable to strike juror M.B. to ensure he had an unbiased jury. He points out M.B. knew the prosecuting attorney, knew another member of the jury, had previously been victimized, and is married to a liquor rep for the bar where the crimes in this case took place. Bosse argues M.B. was therefore potentially biased. However, the record does not reflect that Bosse attempted to strike M.B. for cause. A party who fails to challenge the jurors for disqualification and passes the jurors for cause waives any objection to their selection. *State v. Huff*, 298 Neb. 522, 905 N.W.2d 59 (2017). When a defendant, through due diligence, is able to discover a reason to challenge a juror, the objection to the juror must be made at the time of voir dire. *Id*. Any prejudice claimed by Bosse as a result of having M.B. on the jury was therefore waived.

BOSSE'S REQUESTED JURY INSTRUCTIONS

Bosse assigns as error the district court's failure to give the jury his proposed jury instructions I, II, III, and IV regarding self-defense and defense of another. Bosse's proposed jury instructions were as follows (bold and underscoring in original; italics supplied):

**(I) SELF DEFENSE**

[Bosse] acted in self defense if:

(1) [Wilson] used or threatened force against [Bosse]; and

(2) under the circumstances as they existed at the time, [Bosse] reasonably believed that the force he used against [Wilson] was immediately necessary to protect the defendant against any such force used or threatened by [Wilson] *or in concert with other assailants*.

(3) The fact that [Bosse] may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in response to that belief.

. . . .

**(II) DEFENSE OF ANOTHER**

[Bosse] acted in defense of another person if:

(l) the Defendant, [Bosse], reasonably believed that [Wilson], by himself or in concert with [Gregory], [Purvis] and [Vansteenberg] used or threatened force against the Defendant's father, [Kim]; and

(2) under the circumstances as they existed at the time, the defendant, [Bosse], reasonably believed that the force he used against [Wilson] was immediately necessary to protect [Kim] against any such force, used or threatened by [Wilson] by himself or in concert with [Gregory], [Purvis] and [Vansteenberg].

(3) The fact that the defendant, [Bosse], may have been wrong in estimating the danger to his father, [Kim], does not matter so long as there was a reasonable basis for what [Bosse] believed and he acted reasonably in response to that belief.

. . . .

## (III) SELF DEFENSE

[Bosse] acted in self defense if:

(1) [Gregory] used or threatened force against [Bosse]; and

[The remaining language mirrors the language for instruction I above except that the name [Gregory] replaces the name [Wilson], and the language set forth in italics above is not contained in this instruction.]

## (IV) DEFENSE OF ANOTHER

[Bosse] acted in defense of another person if:

(1) the Defendant, [Bosse], reasonably believed that [Gregory] by himself or in concert with [Wilson], [Purvis] and [Vansteenberg] used or threatened force against the Defendant's father, [Kim]; and

[The remaining language mirrors the language for instruction II above except that the name [Gregory] replaces the name [Wilson] and the name [Wilson] replaces the name [Gregory].]

These proposed jury instructions would have replaced jury instruction No. 3 that was given by the district court.

Jury instruction No. 3 contained the elements of self-defense in relation to Count I (Bosse's assault in the second degree on Wilson) and Count II (Bosse's assault in the second degree on Gregory). It stated:

### Count I

The Defendant acted in self-defense as to Count I (Wilson) if:

1. [Wilson] used or threatened force against the Defendant; and

2. Under the circumstances as they existed at the time, the Defendant reasonably believed that the force he used against [Wilson] was immediately necessary to protect the Defendant against any such force used or threatened by [Wilson].

The fact that the Defendant may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in response to that belief.

### Count II

The Defendant acted in self-defense as to Count II (Gregory) if:

1. [Gregory] used or threatened force against the Defendant; and

[The remaining language mirrors the language for Count I above except that the name [Gregory] replaces the name [Wilson].]

Bosse argues the jury instructions given at trial incorrectly removed the words "in concert" from the elements for self-defense, and that "in concert" should also be contained in an instruction for the defense of others. As noted by the State, Bosse's proposed instruction III does not include the words "in concert," and essentially mirrors the actual instruction given by the court as to self-defense. Accordingly, like the State, we focus on the other three proposed instructions.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law,

(2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

Bosse cites to cases from Wyoming and Montana for the proposition that the words "in concert" should have been included in the self-defense instructions because failing to include those words "allows jurors to infer that an aggressor must be the person actively causing the harm, rather than an individual working in concert with the aggressor." Brief for appellant at 39. Bosse claims his "criminal justification argument is predicated upon the fact that the assailant was acting in concert with the individuals who he allegedly attacked." *Id*. at 38.

The State argues proposed instruction I is not a correct statement of Nebraska law, and it also includes the phrase "other assailants," which the State asserts is a "generalized group of actors," which is not allowed in a self-defense claim under *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999). It argues proposed instructions II and IV are not warranted by the evidence because Bosse did not see anyone strike his father (therefore there was no immediate danger), and that they are also inaccurate statements of Nebraska law. The State additionally argues proposed instruction IV is inconsistent with Bosse's defense theory at trial because Bosse argued he did not stab Gregory, but that Gregory was injured grabbing the blade, and therefore there was no immediate danger that he would need to use force against Gregory to protect Kim. Finally, The State argues proposed instruction III was given except for slight differences in the way the victim and defendant were named.

We find the district court did not err in rejecting Bosse's proposed jury instructions I, II, III, and IV. The evidence does not support the inclusion of the phrase "in concert" in any of Bosse's four proposed instructions.

Bosse's proposed instruction I is not supported by the evidence. There are slight differences in how the victim and defendant are named, but the only substantive difference between the language of proposed instruction I and the language of the given instruction (jury instruction 3, Count I) is that Bosse's proposed instruction would have added "or in concert with other assailants" after "such force used or threatened by Anthony Wilson."

There is nothing in the record that indicates Bosse stabbed Wilson to protect himself from force "used or threatened" by assailants acting in concert with Wilson. Bosse did testify he was trying to protect himself once he was being "assaulted" outside, but he stated he stabbed Wilson while he was inside the hallway. Wilson then picked him up and pushed him through the door, through the smoking area gate, and out into the street. Bosse also stated he was being pushed through the hallway out of the bar by Wilson, and that he had been stabbed twice by patrons behind Wilson in the hallway. However, he did not give any testimony indicating in any way that he felt his safety was threatened before he stabbed Wilson.

Instead, Bosse was quite clear at trial that he stabbed Wilson because he was just "trying to get [Wilson] out of [his] way" so he could get back into the bar to help his father. His testimony was that stabbing Wilson was part of a plan he created while he was in the short hallway struggling with Wilson. He stabbed Wilson in the back because he did not want to hurt or kill him, and just

wanted Wilson to back up into the patrons behind him. This would have allowed Bosse access back into the bar to take care of his father.

The sum of Bosse's testimony shows he stabbed Wilson to move him, not because he was defending himself from anyone acting in concert with Wilson. Therefore the different language in Bosse's proposed jury instruction I was not supported by the evidence, and the district court did not err in rejecting it.

The State correctly notes proposed instruction III is substantially the same instruction as the one given to the jury, with a small difference as to how Bosse and Gregory are named. We find this difference did not prejudice Bosse and the district court did not error in also rejecting Bosse's proposed instruction III.

Finally, proposed instructions II and IV are also unsupported by the evidence. The two instructions are essentially identical except that one would have applied to Bosse stabbing Wilson (proposed instruction II) and the other would have applied to Bosse stabbing Gregory (proposed instruction IV). These instructions are premised on the evidence sufficiently showing that Bosse reasonably believed that the force he used against Wilson and Gregory was immediately necessary to protect his father against any force, used or threatened, by Wilson or Gregory, individually, or in concert with others. However, there is nothing in the record that shows force was immediately necessary to protect Kim because there is no evidence Bosse was aware of any further threat to Kim. Bosse's testimony was that he could see his father was on the ground, and he appeared to have an injury to his head with blood running down his face. Bosse did not see what injured his father in the first place, and he did not see anyone striking his father after he saw him bleeding. Bosse was asked if he could see anyone else near his father and he responded, "I really didn't have a chance to see people around. It was just everybody was there . . . . [I]t was hard to see anything other than my father on the ground because that's what I was pinned in on." Bosse's testimony about his mindset as he was fighting to get back into the bar was: "You know, what are they doing to my dad[?] That's what I thought. If they're doing this to me, what are they doing to my father[?]" Bosse was asked on redirect if he felt his father was in "grave danger" when he was still in the bar, and he responded, "[A]bsolutely I felt that way."

It is understandable that Bosse would be upset about his father being injured and on the ground. However, Bosse did not testify as to any further threat to his father that he perceived in any form. He stated he did not even see the cause of his father's injury, and he did not notice anyone near his father. Despite his understandable concern over not being allowed to tend to his injured father, there is no description of an ongoing or impending attack on Kim by anyone, either working alone or in concert with the people escorting Bosse out of the bar. There was no evidence showing that force was immediately necessary to protect Kim from anyone after Bosse realized Kim was injured. Therefore, the evidence does not warrant an instruction as to the defense of others regarding Bosse's assault of either Wilson or Gregory. Accordingly, it was not error for the district to decline giving Bosse's proposed instructions II and IV.

In summary, we find no error by the district court's decision to decline Bosse's proposed jury instructions I through IV.

EXCESSIVE SENTENCES

Bosse argues "the term of [his] incarceration is unreasonable considering the charges and the nature of the case." Brief for appellant at 39. That is the full extent of Bosse's argument. The State contends that Bosse has not "sufficiently argued this assignment of error and it has thus been waived." Brief for appellee at 19. Although it is true Bosse does not properly develop his argument on this issue, we nevertheless address its merits.

Bosse's sentences were all within the statutory limits. He was sentenced to 10 to 12 years' imprisonment on each count of assault in the second degree (Counts I and II), which are Class IIA felonies under Neb. Rev. Stat. § 28-309 (Reissue 2016), and are punishable by up to 20 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 2016). He was also sentenced to 3 to 5 years' imprisonment on each count of use of a deadly weapon (other than a firearm) to commit a felony (Counts III and IV), which are Class II felonies under Neb. Rev. Stat. § 28-1205 (Reissue 2016), and are punishable by 1 to 50 years' imprisonment. See § 28-105. Finally, he was sentenced to 2 to 4 years' imprisonment for possession of a deadly weapon by a prohibited person (Count V), which is a Class III felony under Neb. Rev. Stat. § 28-1206 (Reissue 2016), and is punishable by up to 4 years' imprisonment, a $25,0000 fine, or both. See § 28-105 (any person who is sentenced to imprisonment for a Class I, IA, IB, IC, ID, II, or IIA felony and sentenced concurrently or consecutively to imprisonment for a Class III, IIIA, or IV felony shall not be subject to post-release supervision). The district court ordered Counts I, II, and V to run concurrently to each other. Counts III and IV were ordered to run consecutively to each other and consecutively to all other counts.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017). When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

Bosse's presentence investigation report shows his criminal history began at age 14. He has numerous misdemeanor convictions. Bosse was also sentenced to 123 months in a federal prison for two felony convictions (possession with intent to distribute methamphetamine and possession of a firearm in relation to a drug offense), which was extended for possession of a prohibited object (shank) while he was serving his sentence. As part of the presentence investigation, Bosse was interviewed by a probation officer who conducted a Level of

Service/Case Management Inventory (LS/CMI) which evaluated eight categories of criminogenic risk factors for recidivism. Bosse was rated as a "Very High" risk in four categories and "High" risk in the remaining four categories of the LS/CMI. His overall rating for risk to reoffend was "Very High."

The district court noted Bosse showed no remorse for the actions he took, and that Bosse stated he would take the same action again in the same situation despite the serious injuries to the victims. The court also discussed Bosse's criminal record, noting his failed parole for his last conviction, and his "Very High" risk to reoffend rating on the LS/CMI, which the court felt made Bosse an unsuitable candidate for probation.

Given the record before us and the court's stated reasoning, we do not find the court's sentences untenable or unreasonable, nor do we find them to be against justice or conscience, reason, and the evidence. We therefore affirm all sentences.

## CONCLUSION

For the reasons set forth above, we affirm Bosse's convictions and sentences.

AFFIRMED.